JEFFREY DAVID ISAACS
3553 West Chester Pike
PMB #177
Newtown Square, PA 19073
Telephone:    (215) 609 - 4625
Mobile:        (610) 202 -1460
E-Facsimile: (310) 564-0432
Email: jdi@alum.dartmouth.org

RECEIVED
BUT NOT FILED

FEB – 4 2008
3:38

CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION
BY _____ DEPUTY

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEFFREY DAVID ISAACS | Case No. CV-06-3338 GAF (Ex) |
| Plaintiff, *pro se*, | |
| -V- | **MEMORANDUM OF** |
| | **CONTENTIONS OF** |
| UNIVERSITY OF SOUTHERN CALIFORNIA; | **FACT AND LAW** |
| Defendant. | |
| | Pre-Trial Date:  February 25, 2008 |
| | Trial Date:        March 25, 2008 |

**BY FAX**

Plaintiff JEFFREY DAVID ISAACS submits the following Memorandum in compliance with Local Rule 16.3. DATED: February 4th 2008.

-1-

1

2

## I. FACTUAL CONTENTIONS - STATEMENT OF THE CLAIM

3    Plaintiff Jeffrey David Isaacs was a medical student at the University of Southern California

4    Keck School of Medicine. He had been admitted to the Class of 2009 with an academic background

5    exemplary of the performance typically exhibited by individuals admitted into the Keck program; he

6    achieved well during prior studies at Dartmouth College, Vanderbilt University Law School, and

7    Wharton / Insead, and he had well-rounded extracurricular accomplishments that one would expect of

8    a future doctor.

9    This case sets forth that Plaintiff was wrongfully dismissed from the Keck School of

10    Medicine after he became *persona non grata* for making a legal threat. After Plaintiff complained

11    about harassing behavior and drug use carried out by a small group of well-connected students,

12    Defendant USC and its agents took retaliatory and discriminatory action against him. The

13    Defendant's agents, despite being highly educated medical professionals, purposefully and/or

14    negligently ignored Plaintiff's condition, their contractual duty of care towards him, and his legal

15    rights when they moved to suspend and dismiss Plaintiff in retaliation against his claims. False

16    allegations against Plaintiff initially purported violations of Keck "professionalism" code, however

17    the same alleged behavior was later characterized as a campus safety issue. The evidence, including

18    specific email tracking reports, shows that these adverse actions and allegations against Plaintiff

19    followed shortly after the commencement of legal action against the Defendant's agents.

20    Plaintiff's pre-existing condition was brought to the surface through the conduct of a fellow

21    student, Amy Baughman, who engaged in a course of conduct consisting of mischievous flirting

22    followed by the ridicule and harassment of the Plaintiff. While no person would have reacted well to

23    the immature and shameful conduct of Ms. Baughman, the Plaintiff was more pront to an adverse

24    emotional reaction because of his thoroughly documented disability. The testimony and evidence at

25    trial will establish that she and her friends persisted in intentionally exacerbating Plaintiff's condition

26    even after becoming aware of it and even after being requested to cease the inappropriate behavior.

27    The conduct was not only inappropriate, particularly for a group who had been admitted to

28    Keck, it generated a series of events that led to the Plaintiff's ultimate dismissal from the school. As

1  alleged by Plaintiff, the evidence will show that rather than demonstrate compassion for the Plaintiff
2  and take appropriate action to help him to overcome the emotional distress brought on by this small
3  group of classmates, the administrators of Keck were influenced by and sought to adhere to the
4  wishes of the Robert William Baughman. At the time, before leaving his post, Dr Baughman was an
5  influential member of the National Institutes of Health. Without anything even remotely resembling
6  fairness or administrative due process, the administrators of Keck undertook a retaliatory course of
7  conduct designed to assign blame to the Plaintiff and to portray Ms. Baughman as the victim of
8  harassment. Instead of following standard procedure to counsel and possibly effect probation when a
9  student controversy arises, Keck scapegoated Plaintiff and aligned him for dismissal. There can be no
10 doubt that the Plaintiff was most unfortunate, for he not only suffered at the hands of an insensitive
11 and mischievous fellow student, his misfortune was compounded by the fact that the student had an
12 influential and powerful father who apparently made a snap judgment about the Plaintiff and then
13 convinced the officials at Keck to accept his judgment. There can be no doubt that had Ms.
14 Baughman not been the daughter of a Director of the NIH, with strong ties to Keck, the process that
15 led to Plaintiff's dismissal would have never occurred.

16     The central issue in this case is whether it was legal, and appropriate, for the Keck School to
17 treat the Plaintiff's emotional condition as a disciplinary matter rather than as a medical condition
18 requiring treatment, and likewise, whether complaints from an NIH Director created the impetus to
19 dismiss Plaintiff.

20     **II.     FACTS APPLICABLE TO ALL CAUSES OF ACTION**

21     1.    Plaintiff Jeffrey David Isaacs was a student in good standing at Keck prior to any
22           grievances he made to students and faculty.

23     2.    Plaintiff's official Peer and Faculty reviews at USC Keck were overwhelmingly
24           positive.

25     3.    Plaintiff made a legal complaint via email to Amy and Robert Baughman on or around
26           January 9th 2006. Certified email tracking shows that this email dialogue was
27           forwarded between ROBERT WILLIAM BAUGHMAN, PETER KATSUFRAKIS,

28

PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

No. CV-06-3338 GAF (Ex)

1    and BRIAN HENDERSON (see below) within minutes and hours, establishing the
2    primary retaliation point this case centers around.

3    4.    (Former Defendant) ROBERT WILLIAM BAUGHMAN, Ph.D was a Director of the
4    National Institutes of Health ("NIH") Neurological Diseases division ("NINDS"). The NIH oversees
5    the grant awards of United States government funds to medical schools, including the USC Keck
6    School of Medicine. Medical schools in the United States compete vigorously for these funds;
7    traditionally, their rankings directly correlate to NIH funding. In 2006, the NIH Congressional
8    Appropriations totaled $27.8 billion. Robert Baughman's NINDS group oversees the disbursement of
9    $1.86 billion of these appropriations.

10    5.    (Former Defendant) BRIAN E. HENDERSON, M.D., has served as the Dean of the
11    Keck School of Medicine since 2004, although he announced his resignation in early 2007. Keck's
12    website asserts that Henderson was the recipient of and/or principal investigator of approximately
13    $40 million in Federal NIH Grant Funding over the past five years.

14    6.    (Former Defendant) PETER J. KATSUFRAKIS, M.D., M.B.A was, before resigning,
15    the Associate Dean for Student Affairs at Keck, and reported to Clive Taylor, M.D., Ph.D., Senior
16    Associate Dean for Educational Affairs. Dr. Taylor reported directly to Henderson. Henderson
17    reports directly to USC President Steven B. Sample.  (Former Defendant) JAMES M. H. BALL is
18    employed as University Counsel in the Office of General Counsel at the University of Southern
19    California.

20    7.    Plaintiff suffered an organic brain injury in 1998. In 2001, Plaintiff was diagnosed
21    with PTSD. Nonetheless, Plaintiff excelled in several rigorous academic and professional programs
22    after this diagnosis.

23    8.    Plaintiff commenced medical studies in early August 2005 at USC. His first semester
24    evaluations at USC describe him as a logical, intelligent, and compassionate medical student.
25    Plaintiff integrated well with his study group and clinical rounds group, according to these same
26    evaluations. Plaintiff received nine positive (out of nine total) first semester evaluations by objective
27    members of the Keck Community. Dr Robert Stellwagen and Dr Brett White were professors of
28    Plaintiff in his Professionalism in Medicine class, and determined that Plaintiff excelled in all areas

-4-

1  of Medical Professionalism. Clinical peers Amy Savagian, Daria Younessi, Cambria Garrell, Arash
2  Motamed, and Leah Ruslen gave Plaintiff very strong peer evaluations. Dr. Fred Kuyt and Dr. Mark
3  Vogel, of Cedars Sinai Medical Center, gave Plaintiff excellent evaluations for his clinical work and
4  interpersonal skills. In addition to these positive formal evaluations, Plaintiff earned appointments to
5  two leadership positions which recognized his previous work in international medicine: class
6  representative for Operation Smile, and US National Officer for the International Medical Students
7  Association, a United Nations NGO.

8      9.      About halfway into the first semester of medical school, a pattern of harassing
9  behavior directed towards Plaintiff began; this behavior was carried out by several classmates,
10  including Amy Baughman, daughter of Robert Baughman. On October 8, 2005, on a class trip to Las
11  Vegas, Plaintiff first interacted with an intoxicated Ms. Baughman, in which he rejected an advance
12  she made.

13      10.     A 'he-said, she-said' apparently developed over the next month, escalating into
14  seemingly inappropriate statements and activity carried out by Amy Baughman, Alexander Jack, and
15  Dave Braxton. All three were regular/casual drug users, as suggested in an email to Plaintiff from Ms.
16  Baughman which asserts "no problem. last weekend was a bust because i had to drive couldn't get
17  wasted or get high."

18      11.     Inappropriate behavior directed at Plaintiff quickly escalated, and on November 16,
19  2005, Plaintiff requested Ms. Baughman cease the provocation she had directed towards him.
20  Plaintiff was explained to Ms. Baughman that he suffered from a certain psychiatric condition that
21  she exacerbated.

22      12.     In response to an informal complaint by Plaintiff, Ms. Baughman replied, "Are you
23  threatening me? I don't have friends who threaten me." She continued, "I got in to med school
24  through connections, and I will get a residency through connections. My father knows people here."

25      13.     Against his instructions, Plaintiff continued to perceive harassment from Ms.
26  Baughman. This prompted Plaintiff to make another written request for Ms. Baughman to stop her
27  offending behavior. Subsequent to this request, he was involved in an exchange of unpleasant words
28  with Ms. Baughman upon seeing her at the Keck Library.

14.     Distressed, and in lieu of formally reporting Ms. Baughman to the Keck Administration, Plaintiff tried to convey to Ms. Baughman his grievances. In turn, Ms. Baughman took Plaintiff's grievance and used it to pre-empt a complaint by making one of her own. On November 21, 2005, Amy Baughman met with Katsufrakis to complain. Katsufrakis arranged a group meeting with Plaintiff, Amy Baughman, and himself. At one point during the meeting, Katsufrakis and Ms. Baughman started to laugh at Plaintiff. Plaintiff expressly indicated that he felt Baughman's complaint was itself harassing and aggravating his prior condition. Katsufrakis wrote an email to Baughman, indicating that he understood Plaintiff's position regarding a prior psychiatric condition, and found Plaintiff's objection to be reasonable. Furthermore, Plaintiff asked Katsufrakis to advise him what steps could be taken to ensure that Amy Baughman and her friends' would not continue to taunt him on the basis of his disability.

15. The SMS cell phone messages sent in November 2005 were first characterized as "embarrassing" and "unprofessional," and after litigation commenced, as a "campus security" threat. At one point, in retaliation and legal defense, USC turned over the case to the LAPD. The LAPD rightfully determined that Plaintiff posed no credible threat to anyone's safety.

16.     Ms. Baughman began to openly discuss the conflict with classmates, which prompted Plaintiff's clinical group to be worried for him and to request a meeting with Katsufrakis to support him. Minutes from this meeting were redacted from Plaintiff's student file.

17.     Early during the course of these events, Katsufrakis counseled Plaintiff and would even call him after school hours. The Liaison Committee for Medical Education ("LCME"), which accredits US medical schools, stipulates that the psychiatric counseling of medical students must not be provided by the Deans. Despite this rule, Katsufrakis counseled Plaintiff and later would use these sessions against Plaintiff. In one instance, Katsufrakis began to cry when Plaintiff described his disability. However, any initial sympathy expressed by Katsufrakis would quickly fade after Baughman and Henderson became involved. Likewise, an attorney that Plaintiff's parents hired to represent him at USC likewise asserted that Katsufrakis acted in a conflicted manner.

18.     Plaintiff's situation deteriorated and the dispute remained unsettled. He would frequently exhibit distraught emotional reactions in follow-up meetings with the Keck School of

PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW
No. CV-06-3338 GAF (Ex)

Medicine Deans. On December 1, 2005 Plaintiff communicated to Ms. Baughman that he was so bothered by the situation that he was considering hiring a lawyer. A short-lived reconciliation was reached with Ms. Baughman. Ms. Baughman wrote that she was able to chalk-up Plaintiff's November 18th grievance to being "out of sorts" – a far cry from later harassment allegations, which were based chiefly upon the same isolated incident of November 18th.

19.    On December 16, 2005, first semester exams finished and immediately thereafter, Ms. Baughman, who had entered the exam an hour late and was allegedly at risk of failing, became hostile towards Plaintiff. Plaintiff was assaulted by one of her friends in a vehicular incident. Over winter break, Plaintiff made a written request to Ms. Baughman to clarify the recent events and to receive group counseling to mitigate the dispute.

20.    After consulting applicable disability and harassment law over winter break, and because his medical studies were becoming impeded by these affairs, on January 9th, 2006, Plaintiff sent a letter to Ms. Baughman and Robert Baughman stating his intention to initiate a civil lawsuit. Robert Baughman immediately contacted the Keck Deans and informed them, among other things, that he was flying out to California to "consider how to proceed" (SPC Email Records). On January 10th, within hours of Robert Baughman speaking with the USC Defendants from the NIH headquarters, two armed USC Department of Public Safety police officers entered Plaintiff's classroom shouting his name.

21.    Email certified-receipts show that Plaintiff's letter warning of future legal action to the Baughmans was forwarded from NIH headquarters to former USC Dean Henderson within minutes. A chain of forwarding occurred in the next several days between administrators. Within days, several proceedings against Plaintiff were initiated. The Deans assisted Ms. Baughman in filing a fabricated and retaliatory Harassment report with campus police. The report contains obvious factual errors; most importantly, it is incorrectly dated to give the impression that the stay-away letter was delivered prior to Plaintiff's January 9th letter-of-intent to initiate a lawsuit. There is no debate that the entry of the campus police into Plaintiff's classroom occurred on January 10th. It also describes a fabricated account of the aforementioned vehicular altercation, and the evidence will demonstrate that this was in response to an informal complaint of assault made by Plaintiff.

22.     Plaintiff received further information from credible sources that suggested Robert Baughman was improperly communicating with Katsufrakis and Henderson to harm his standing at USC. Furthermore, Assistant Dean Joel Schechter stated to Plaintiff that "Some decisions were made at the top. I understand if you feel pre-judged." Plaintiff took this to mean that he was being scapegoated for the unpleasant situation that had unraveled in the first year medicine class. In other words, after announcing his lawsuit, a "knee-jerk" retaliation had taken place. Plaintiff sent a Settlement Offer and Verified Complaint pleading cover to Robert Baughman and Amy Baughman asking them to cease any action that jeopardized his progress in medical school. According to email tracking information, this settlement letter would be forwarded between the Defendant's agents for the following weeks, indicating that administrative attention was in fact focused on Plaintiff's legal action rather than any purported harassment. Former Dean Katsufrakis phoned Plaintiff and threatened him not to send any more legal documents to Baughman. Katsufrakis explained that, because of Baughman's "security clearance" and classified activities, such emails could trigger "automatic actions" that would be undesirable to Plaintiff.

23.     Plaintiff received an emotional, irate phone call from David Braxton in which he yelled furiously at Plaintiff to stay away from Ms. Baughman and to drop all complaints. Within days of the discussions between Baughman and Henderson, David Braxton was advised to spearhead a complaint to initiate an internal review process with the Student Performance Committee (SPC) that would consider Plaintiff's status as a medical student. According to the complaint itself, Former Dean Katsufrakis offered "personal advice" that Braxton write this highly defamatory complaint. There can be little doubt that Katsufrakis and Ball helped craft the SPC complaint to fashion it in a way that would give the appearance of a legitimate administrative proceeding's due process. In fact, the complaint itself was retaliatory and in violation of USC's university-wide retaliation policy. The complaint purported to speak for "the Class of 2009 as a whole," when in fact, it spoke for Mr. Braxton and a few of his immature, drug-abusing friends. The complaint took one of Plaintiff's Nov. 18th grievance text-messages out of context, faulting Plaintiff for Ms. Baughman's purported reaction to the severity of the situation. Braxton's complaint wrongly referred to "multiple" instances of

1  fictitious events, attempting to amplify the severity and mischaracterize the nature of a single,
2  isolated episode.

3      24.    Subsequent to the issuance of the SPC complaint and stay-away letter, knowledge of
4  this situation became rather widespread at Keck. On two occasions, Dean Clive Taylor witnessed
5  Plaintiff in an ostracized and depressed state in the middle of campus. Plaintiff had become *persona*
6  *non grata,* although the faculty didn't really understand the full nature of the legal actions behind
7  everything. Plaintiff met with Dean Taylor to discuss solutions to the problem. Plaintiff told Taylor
8  he "felt he was getting a raw deal," to which Taylor responded "Sometimes, you get a raw deal."

9      25.    Ms. Baughman and her friends used the "stay away" order to taunt Plaintiff, now that
10  her father, Former NIH Director Baughman, had demonstrated his ability to influence  Henderson
11  and the USC administration. Ms. Baughman would convene groups of friends at obvious entryways
12  of the classrooms and cafeterias, so that Plaintiff would need to walk in large 'semicircles' to avoid
13  coming in contact with Ms. Baughman. Plaintiff recorded video of one such episode. Ms. Baughman
14  and several of her friends would resort to laughs, smirks, giggles, glances and coughs so as to
15  provoke and upset Plaintiff. Plaintiff complained of this to an unreceptive administration.

16      26.    Plaintiff continued to suffer acute mental distress during this period, and symptoms
17  went improperly handled by the Deans, despite being experienced physicians and despite Plaintiff's
18  considerably worsened state. USC and the Individual Defendants failed in their duty to ensure that
19  Plaintiff was adequately coping with the emotional demands of his early medical studies. Plaintiff's
20  parents each made numerous, unanswered efforts to communicate with Henderson. Henderson,
21  however, conversed in significant detail with Robert Baughman, according to email tracking
22  information and other sources.

23      27.    Although unable to obtain a meeting with Henderson, who presumably has some form
24  of relationship with Robert Baughman, Plaintiff's parents were able to meet with Former Dean
25  Katsufrakis and Dean Taylor. In retrospect, Plaintiff's parents felt they were "patronized" during their
26  meeting. In this January 30th meeting, they complained to Taylor of bullying and harassment.  They
27  complained that "seemingly omnipotent students" were causing undue stress to Plaintiff.  They
28  informed the Deans of Plaintiff's medical condition and had a discussion about the duty of the Deans

1    to compel Plaintiff into treatment. At the time, Katsufrakis felt treatment wasn't urgently needed.

2    The Deans stated that they would investigate any evidence available concerning bullying, and would

3    allow Plaintiff's ICM Professor, Dr. Kuyt, to be present in any administrative hearings. The Deans

4    failed to honor either of these promises.

5        28.    Although the Deans weren't concerned about Plaintiff's health, others were.

6    Classmate Amy Savagian emailed Plaintiff that she was "really worried" about him and had

7    researched a Medical SOS group on his behalf. She told him that he had deteriorated to the level of

8    appearing "physically ill." According to Dr. Sandler's testimony, Plaintiff was in obvious need of

9    emergency treatment, and the Deans, at best, negligently failed to seek treatment for him.

10        29.    Plaintiff emailed Former Dean Katsufrakis requesting that he reschedule the SPC

11    hearing, because Plaintiff was expected to attend a United Nations recognized IFMSA NGO

12    leadership conference in Chile. Katsufrakis responded somewhat harshly, denying this request.

13    Plaintiff began to justifiably fear that if the school was preventing him from continuing the

14    international humanitarian work he began before his enrollment at Keck, it was likely that they were

15    planning to take extreme measures at the SPC hearing.

16        30.    On February 17, 2006, as a result of his inability to attend classes without interference,

17    Plaintiff failed a hematology final exam, the first such failure in Plaintiff's entire academic career.

18    Nonetheless, a single failing grade is allowable (and not uncommon) under the Keck curriculum

19    guidelines. Plaintiff missed the passing mark by 4%, however Plaintiff's attendance in hematology

20    dropped off drastically (nearly 40%) as a result of the harassment at Keck. Simply put, Plaintiff's

21    academic ability is not genuinely at issue in the present lawsuit. Plaintiff, generally unable to think

22    clearly after failing the exam, telephoned Ms. Baughman, during Spring Break, to discuss ways to

23    end the conflict. Ms. Baughman advised Plaintiff to apologize for everything so that the school would

24    let him stay enrolled. She confirmed that her father was in communication with Henderson.

25    Concerned about a possible violation of the stay-away order, she ended the twenty-five minute phone

26    call by telling Plaintiff "this call didn't happen." She then wrote Katsufrakis an email stating that she

27    "was in a pickle," that she "didn't want to be responsible for suspending [Plaintiff]," and that

28

1    although "slightly crazy," she "didn't feel that [Plaintiff] was physically threatening." She asked to

2    discuss the matter with the Deans upon returning from her Spring Break in Lake Tahoe.

3        31.    On February 27, 2006, Plaintiff was subject to a disciplinary Student Performance

4    Committee (SPC) hearing regarding the aforementioned issues. As the subject of prolonged

5    intimidation at Keck, Plaintiff did as previously agreed with Ms. Baughman and did not contest most

6    of the false allegations. The allegations generally concerned "unprofessional" behavior. Generally,

7    the meeting only discussed several misleading issues concerning Plaintiff and misrepresented or

8    failed to mention the overwhelming majority of evidence that Katsufrakis and Ball had privately

9    assembled. Plaintiff believes the faculty had no full understanding of the nature of what had

10    transpired. Certainly, Plaintiff was too unstable and afraid at that point to communicate his story.

11        32.    Katsufrakis and Ball deliberately prevented key evidence and testimony from being

12    presented at the SPC hearing which would have been most favorable to Plaintiff. They failed to return

13    Dr. Kuyt's multiple phone calls requesting to be present at the SPC meeting. The right to have Dr.

14    Kuyt testify was also promised to Plaintiff's parents by Dean Taylor. Plaintiff has learned that Mr.

15    Ball and other Keck administrators have pressured Dr. Kuyt, a member of the Keck Admissions

16    Committee, not to support Plaintiff in his efforts to obtain medical accommodation or to defend his

17    right to remain at Keck.

18        33.    The following day, Plaintiff was handed the SPC decision indicating immediate

19    suspension and imminent dismissal. Former Dean Katsufrakis began the meeting in which he

20    delivered this decision by saying that "things went pretty well at the hearing." Plaintiff felt this only

21    served as continued harassment when he learned about the severity of the decision. Katsufrakis then

22    ended the meeting with what appeared to be a malicious double-entendre; he looked at his clock and

23    said "OK Jeff, I'm kicking you out." The formal letter describing the suspension mandated Plaintiff

24    to undergo an immediate psychiatric evaluation As explained to Plaintiff by members of the Faculty,

25    the Deans encouraged the Faculty to suspend Plaintiff, on the basis that once he received treatment,

26    he could resume his studies . USC, via Katsufrakis, Quinn (via Kuyt) and Henderson, made numerous

27    offers to Plaintiff to leave Keck voluntarily so that he could 'clear his record and reapply for the

28

PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW
No. CV-06-3338 GAF (Ex)

1   following year. ' Plaintiff asserts that such offers were made in response to the threat of a lawsuit,

2   and support the fact that Plaintiff's dismissal was retaliatory rather than meritorious.

3        34.     Plaintiff expressed his intent to immediately appeal the suspension, and requested a

4   meeting with Henderson to discuss his conflict-of-interest and failure to supervise. In the words of a

5   Keck admissions officer Fred Kuyt, USC was "pissed off" because of Plaintiff's early allegation –

6   and refusal to drop his claim - against Baughman and Henderson. Upon requesting the meeting with

7   Henderson, Plaintiff received several "no trespass" letters from USC. Plaintiff entered the meeting

8   with Henderson, and Mr. Ball was an unannounced participant who smirked at Plaintiff throughout

9   the meeting. Curiously, Ball gave Plaintiff a letter 'modifying' the March 1st Suspension Letter. The

10  modification changed the *requirement* for psychiatric evaluation to a *recommendation* for counseling.

11  Thus, the University administrators appeared to be positioning themselves to attempt to subvert any

12  Section 504 claim. Moreover, they were preparing to dismiss the Plaintiff, without properly

13  explaining their motivations to the Faculty.

14       35.     Traumatized by these events and concerned about his health, Plaintiff was admitted to

15  the UCLA Emergency Room shortly after receiving the SPC decision. Plaintiff was admitted to

16  intensive inpatient care at the UCLA Neuro-Psychiatric Hospital and remained there for

17  approximately one month. This was his first such hospitalization.

18       36.     Plaintiff was discharged to UCLA Staff Physician Dr. Wayne Sandler, M.D., Ph.D on

19  March 27th, 2006 for outpatient care which has continued to date with apparent success. Dr. Sandler

20  sent a statement to USC to further document Plaintiff's disability and to support Plaintiff's return to

21  Keck. This was presented to USC in the form of a request for a retroactive leave of absence, in lieu of

22  the discriminatory suspension. Furthermore, Dr. Sandler suggested that USC offer support and

23  counseling services to Plaintiff, rather than punishing Plaintiff for his disability. It is Dr. Sandler's

24  belief and testimony that Plaintiff is an individual qualified to study at Keck, and that the negligence

25  and or intentional actions of the Keck administration caused Plaintiff's condition to deteriorate to a

26  critical level.

27       37.     On May 20th, USC denied this reasonable accommodation of Plaintiff's disability

28  under the Rehabilitation Act. Plaintiff has received specific information from multiple witnesses that

-12-

1  Mr. Ball took active, surreptitious measures to prevent the granting of a medical leave to Plaintiff.
2  Plaintiff asserts that Mr. Ball was integrated in the administrative maneuvers of Keck beyond the
3  appropriate scope of University Counsel.

4      38.    On May 23rd, Amy Baughman sent an email to the entire Keck student body, over five
5  hundred students, to advertise her apartment. The email concluded "Extra: Sorry no pets, no smokers,
6  no crazies pleeze." On May 26, Plaintiff requested that Katsufrakis investigate to determine if this
7  email was sent to harass Plaintiff, as it had similarities to previous harassing statements she made
8  which ridiculed mental illness. Katsufrakis sent a curt reply, refusing to consider this request.

9      39.    This lawsuit was originally filed in the United States District Court on May 30th, 2006.
10 Plaintiff requested that USC postpone Plaintiff's dismissal hearing, originally scheduled for June 7th,
11 pending resolution of the lawsuit. Mr. Ball replied that he "wasn't concerned" about the lawsuit and
12 that the dismissal hearing would proceed. Plaintiff sought a TRO enjoining and restraining USC from
13 suspending/dismissing Plaintiff, which was denied on procedural grounds.

14     40.    On June 7th, a dismissal hearing was held. Plaintiff's faculty advisor, Dr. Fred Kuyt, a
15 member of the Keck Admissions Committee and a kidney transplant surgeon at Cedars-Sinai Medical
16 Center and Century City Hospital, appeared against the wishes of Mr. Ball and Katsufrakis. Dr. Kuyt
17 and Dr. Sandler were not even introduced at the meeting, suggesting that Katsufrakis intended to
18 discredit them in front of the SPC Faculty. Dr. Kuyt testified that dismissing Plaintiff would be
19 unconscionable, that Ms. Baughman had serious character problems and was generally culpable, and
20 that Plaintiff was well liked by all those who actually knew him. As witnessed by Sandler and
21 Marina, at absolutely no point during the hearing was any issue of campus security threat raised.
22 Issues raised were concerning the ability of Plaintiff to return to work with his colleagues, and his
23 mental status in relation to his ability to be a doctor.

24     41.    On June 13th, Katsufrakis informed Plaintiff that after "due deliberation" – which
25 Plaintiff vehemently denies existed - the SPC voted for his dismissal. In Keck's dismissal letter, the
26 grounds for dismissal was formally alleged to be "for behavior that was not consistent with the
27 essential characteristics and abilities required for completion of the M.D. degree at the Keck School
28 of Medicine."

42.    Plaintiff sent a Petition to the SPC and Dean Clive Taylor which documented numerous violations Plaintiff witnessed during the course of his studies at Keck.

43.    On June 22nd, Plaintiff's attorney, Mrs. Nina Marino, filed an appeal with Dean Clive Taylor requesting a reversal of the dismissal recommendation.

44.    In response to Plaintiff's appeal, Dean Clive Taylor created a five person *ad hoc* subcommittee to reconsider the recommendation for Plaintiff's dismissal. This committee never met with Plaintiff or his attorney, and merely "rubber-stamped" Plaintiff's illegal dismissal. Likewise, President Steven Sample never responded to multiple phone calls and appeal letters by Plaintiff and his parents.

45.    The Defendant's allegations against Plaintiff have escalated over time, despite Plaintiff's total absence from the school. Behavior that was originally characterized as "professionalism" issues escalated to "campus security" threats after this lawsuit was filed. As mentioned in this memorandum, after email exchanges between the NIH and USC, a retaliatory and fabricated harassment report was issued on January 11th.

47.    Plaintiff sought ongoing psychiatric care after his dismissal. Since, Plaintiff was diagnosed with trench-mouth (acute necrotizing ulcerative gingivitis). Plaintiff never had any related condition prior to his enrollment at USC, and has been informed that the most likely cause was the stress inflicted on him by the Defendant USC.

### III. CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### RETALIATION UNDER

### SECTION 504 OF THE REHABILITATION ACT OF 1973 (29 U.S.C. § 794)

48.    A *prima facie* case of §504 retaliation exists because

(1) Plaintiff engaged in legally protected activity;

(2) Defendants knew about the Plaintiff's exercise of this right;

-14-

1

2          (3) Defendants then took an action adverse to the Plaintiff; and

3

4          (4) the protected activity and the adverse action are causally connected.

5

6          Retaliation is evidenced after reasonably investigating the timing of the major events leading

7    up to this lawsuit. On November 16th, 2005 Plaintiff complained to a classmate about harassment. On

8    January 9th, 2006 Plaintiff made certain individuals aware of his intention to file this lawsuit.

9    Plaintiff's email announcing a lawsuit was immediately forwarded between NIH Headquarters

10   (Baughman), Katsufrakis, and Henderson, all of whom left their positions within a year of this

11   alleged conflict of interest. On January 11th and 17th, two fabricated harassment reports were filed

12   against Plaintiff, which ultimately lead to a recommendation for Plaintiff's dismissal. In Plaintiff's

13   case, solid evidence substantiates each element.

14          (1) Plaintiff engaged in legally protected activity

15          Plaintiff asserts multiple instances of legally protected activities, each of which forms

16   the grounds for retaliation:

17          - A polite verbal and written warning to Ms. Baughman that her actions were

18          harassing, and were exacerbating his PTSD.

19          - Plaintiff's statement to Katsufrakis that Defendant USC could be liable for failing to

20          stop harassment that exacerbated Plaintiff's disability (November 23rd). Plaintiff also

21          mentioned the "eggshell skull rule" to Katsufrakis.

22          - A formal letter-of-intent to file a civil suit, dated January 9th .

23          - A proposed settlement, dated January 17th, which suggests Henderson's culpability

24          as one of the 'John Doe' defendants.

25          - Plaintiff's complaint that a "stay away" order was being used illegally.

26          That same week, Plaintiff's parents met with Dean Clive Taylor and lodged a

27          complaint that a group of "seemingly omnipotent" students were taunting Plaintiff,

28          and that this worsened his disability.

PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW
No. CV-06-3338 GAF (Ex)

1    - A disability accommodation request for retroactive medical leave

2    (2) Defendants knew about the Plaintiff's exercise of this right

3    In most cases, Plaintiff emailed, faxed, or personally delivered the aforementioned

4    documents to the Defendant or its agents. In the case of legally protected activity directed

5    towards non-parties, it is clear that the Defendant's agents learned about this activity no later

6    than November 2005. There exists no reasonable doubt that the Defendant's agents, each and

7    every one of them, were aware of the aforementioned legally protected activities.

8    (3) Defendants then took an action adverse to the Plaintiff

9    Defendants caused a series of actions to occur which were adverse to Plaintiff. Most

10   significantly, after email exchanges between the NIH and USC, serious allegations were

11   brought against Plaintiff. Plaintiff was harassed on the basis of his disability. In a most

12   unusual fashion, and with suspect timing, the USC Campus Police interrupted his classroom

13   session in a thinly veiled attempt to humiliate and to retaliate against Plaintiff. Plaintiff was

14   prevented from attending an international humanitarian conference, suspended, and later,

15   recommended for dismissal.

16   (4) The protected activity and the adverse action are causally connected

17   The timing of the aforementioned events and third-party accounts establish a causal

18   connection between the protected activity and the adverse actions caused by Defendant USC

19   and its agents. The duration between the protected activities and the retaliatory events was a

20   matter of hours, or at most, days. In related retaliation cases, "knee jerk reactions" after only

21   several days or a few months following Defendant's learning about the protected activity have

22   been found proximate enough, based on timing alone, to support a *prima facie* case or finding

23   of retaliation. Similarly, Keck "skipped" normal disciplinary measures such as probation,

24   which discovery will establish would have been the normal, non-retaliatory route for a student

25   controversy.

26   A letter from Dr. Sandler implores Defendants not to continue punishing Plaintiff for

27   having a disability (Exhibit A). Similarly, in the SPC hearing both Dr. Sandler and Plaintiff's

28   Professor claimed that the adverse action of dismissal would be grossly unjust (Exhibit M).

-16-

Furthermore, several cryptic administrative actions by USC demonstrate causal connection, including their 'modification' regarding a stipulation that Plaintiff undergo psychiatric evaluation.

## SECOND CAUSE OF ACTION

### DISCRIMINATION UNDER

### SECTION 504 OF THE REHABILITATION ACT OF 1973 (29 U.S.C. § 794)

A § 504 Discrimination Claim is hereby asserted:

(1) Plaintiff is an individual with a disability;

(2) Plaintiff is otherwise qualified to receive a benefit;

(3) Plaintiff was denied the benefit of the program on the basis of his disability; and

(4) Defendant receives federal financial assistance. Plaintiff's case advances evidence compelling each of the necessary elements:

(1) Plaintiff is an individual with a disability

Plaintiff has sought treatment from diverse mental health professionals since 1998, all of whom have independently diagnosed multiple Affective disorders that Plaintiff suffers from. Dr. Wayne Sandler summarizes Plaintiff's diagnosis in the attached Exhibit A. Plaintiff's current primary diagnosis is Bipolar II. Furthermore, Plaintiff's disability is impairing enough to interfere with his normal life activities, and when exacerbated, at one point required a month of inpatient hospitalization.

(2) Plaintiff is otherwise qualified to receive a benefit

Plaintiff is otherwise qualified to study medicine at USC according to past history and the testimony of several respected physicians. Plaintiff received positive first semester evaluations at USC. He also obtained several appointed leadership positions in medicine. His previous success in similarly competitive graduate programs similarly points to his qualification, as does prior volunteer work with an emotionally demanding humanitarian cause. Furthermore, his treating Psychiatrist's letter supports his qualification. In summary, there is no indication that he is not otherwise qualified to study at Keck. Defendants' argument that Plaintiff lacks 'essential characteristics' to qualify is illogical and

-17-

discriminatory; Plaintiff was harassed, his disability worsened, and his hypomanic reaction (described by some as a "minor scuffle") is precisely what Defendants continue to use against him as their only justification for a drastic and unconscionable dismissal. This is despite Dr. Sandler's attempt to describe their erroneous judgement.

(3) <u>Plaintiff was denied the benefit of the program on the basis of his disability</u>

Plaintiff offers numerous factual assertions, from which one can reasonably infer that Plaintiff was denied the benefit to study medicine at USC on the basis of his disability, and/or in retaliation for his assertion of his rights as a disabled person. First and foremost, Plaintiff was harassed on the basis of his disability, denying him benefits of the program. Moreoever, Keck suspended and dismissed Plaintiff because of, chiefly, an isolated incident in which his disability caused him to behave in a hypomanic state, amplifying his expression of a grievance towards another classmate. Keck's dismissal letter formally cited an "inconsistency" with "essential characteristics," but clearly Keck was referring to the hypomanic state associated with Plaintiff's disability. Additionally, Defendant USC denied a properly submitted disability accommodation request for retroactive medical leave, and it can be properly inferred that this was done to "punish" Plaintiff on the basis of his disability.

(4) <u>Defendant receives federal financial assistance</u>

As an LCME-accredited medical school, it is uncontested that Defendant USC receives NIH Federal Funds.

## THIRD CAUSE OF ACTION

### DISCRIMINATION UNDER

### TITLE II OF THE AMERICANS WITH DISABILITIES ACT

An ADA Discrimination Claim is hereby asserted because Plaintiff has already pleaded in his Second Cause of Action that

(1) Plaintiff is an individual with a disability;

(2) Plaintiff is otherwise qualified to receive a benefit;

(3) Plaintiff was denied the benefit of the program on the basis of his disability. Keck and USC are public entities subject to enforcement of Title II of the Americans with Disabilities Act.

-18-

1  Section 1 of the Keck Student Handbook stipulates that The University of Southern California

2  is committed to full compliance with the Rehabilitation Act (Section 504) and the Americans with

3  Disabilities Act (ADA). The ADA states that "no qualified individual with a disability shall, by

4  reason of such disability, be excluded from participation in or be denied the benefits of the services,

5  programs, or activities of a public entity, or be subjected to discrimination by any such entity."

6  ## FOURTH CAUSE OF ACTION

7  ## RETALIATION UNDER

8  ## TITLE II OF THE AMERICANS WITH DISABILITIES ACT

9  A *prima facie* ADA Retaliation Claim is hereby asserted because Plaintiff has already pleaded

10  in his First Cause of Action that

11  (1) Plaintiff engaged in legally protected activity;

12  (2) Defendants knew about the Plaintiff's exercise of this right;

13  (3) Defendants then took an action adverse to the Plaintiff; and

14  (4) the protected activity and the adverse action are causally connected.

15

16  Section 1 of the Keck Student Handbook stipulates that The University of Southern California

17  is committed to full compliance with the Rehabilitation Act (Section 504) and the Americans with

18  Disabilities Act (ADA). The ADA incorporates an antiretaliation provision that Defendants have

19  knowingly violated.

20  ## FIFTH CAUSE OF ACTION

21  ## BREACH OF CONTRACT

22  1) Plaintiff entered into a contract with Defendant USC

23  2) Defendant or USC (or its agents) was aware of this contract and breached it

24  3) Plaintiff suffered damages as a result

25

26  In early 2005, Plaintiff accepted an offer to enroll at the USC Keck School of Medicine.

27  Plaintiff thereby entered into a contractual relationship with the University, in which all bulletins,

28  regulations, policies, and accreditation standards formed the basis for numerous explicit and implicit

-19-

1    contractual rights between the Plaintiff and Defendant USC. Plaintiff relied upon his contractual

2    agreement to study medicine at USC; he placed his career livelihood in USC's hands when he

3    withdrew from Vanderbilt University to attend Keck. Plaintiff fully performed his obligations of the

4    contract; most notably, he paid First-year tuition amounting to approximately $50,000 and, prior to

5    his suspension, was on target to satisfy all Keck curriculum requirements for promotion to the

6    Second-year Medical Course.

7        Plaintiff circulated a Petition alleging numerous LCME accreditation  standards and other

8    contractual rights that were violated by Keck and its agents with regard to Plaintiff, and Plaintiff

9    reserves the right to call this as exhibit during trial.  Katsufrakis acted in a conflicted capacity,

10   violating well-established LCME standards, which lead to drastic consequences for Plaintiff. An

11   Exhibit prepared by Attorney Nina Marino describes an array of contractual due process violations

12   she witnessed during her representation of Plaintiff at Keck. Plaintiff's petition also details how Keck

13   violated USC's own antiretaliation policy. Because Plaintiff made an informal harassment report

14   before any administrative proceedings were initiated against him, Keck was contractually barred from

15   retaliating against Plaintiff. Keck also clearly violated an LCME Standard forbidding political or

16   financial influence in the selection of students. Not only were Ms. Baughman and Mr. Jack politically

17   connected to Keck, but they were ultimately selected for at Plaintiff's expense. Keck also failed to

18   uphold the "stringent character" requirements set forth by the LCME (i.e. bullying and drug use by a

19   small group of 'seemingly omnipotent' classmates) contributing to Plaintiff's injury. Finally, the

20   Keck Student Handbook Section 1 declares that "the Keck School of Medicine will not tolerate the

21   harassment or abuse of, discrimination against, or favoritism towards a student by a teacher or a

22   student colleague." Based upon Plaintiff's recital of the facts applicable to this case, one can

23   reasonably conclude that Defendant USC breached this contractual right by demonstrating blatant

24   favoritism towards Ms. Baughman and her friends, who bullied Plaintiff before and after a 'stay-

25   away' letter was issued. Defendant USC failed to take action, let alone even investigate, Plaintiff's

26   allegations against the students who were tormenting him. Plaintiff duly believes that favoritism of

27   Ms. Baughman resulted in actions by the school that were discriminatory and retaliatory, including

28

-20-

1  the campus police involvement and the suspension decision by the SPC committee. This behavior
2  was a direct and intentional breach of Plaintiff's contractual rights by the Defendants.

3      Defendant USC's breach of contract caused severe damage to Plaintiff. He was traumatized,
4  lost tuition, gave up other professional opportunities and leadership positions, lost at least a year of
5  graduate studies, and suffers continued emotional and physical distress. Most importantly, USC's
6  breach of contract, if not corrected by this Court, will permanently affect Plaintiff's ability to secure
7  any professional career position. USC caused Plaintiff to defer and/or forego substantial future
8  earnings as a physician or other health care professional. Plaintiff has also incurred significant
9  medical and legal expenses.

## SIXTH CAUSE OF ACTION

## FOR INJUNCTIVE RELIEF

12      Defendant USC's wrongful conduct, unless and until enjoined and restrained by order of this
13  court, will cause great and irreparable injury to Plaintiff's career progress and ability to earn a living.
14  Plaintiff is therefore entitled to a permanent injunction, restraining and enjoining Defendant USC
15  from:

16      1. Preventing Jeffrey David Isaacs from resuming his medical studies with the
17  Class of 2010 at the Keck School of Medicine, or preventing Plaintiff's voluntary
18  departure from the Keck School of Medicine or transfer to another medical university.

19      2. Executing or causing the execution of any administrative decision intended
20  to interfere with Jeffrey David Isaacs' enrollment at the Keck School of Medicine,
21  and/or publishing any history of disciplinary action at Keck. Plaintiff could therefore
22  choose to voluntarily leave the Keck School of Medicine under the terms of this
23  injunction with a fully expunged record. Furthermore, USC would be required to issue
24  academic transcripts indicating that Plaintiff was at all times a student in good
25  standing.

26      3. Rescinding or causing the rescinding of any leadership position held by
27  Jeffrey David Isaacs.

28

PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

No. CV-06-3338 GAF (Ex)

4. Allowing any other communication, harassment or action to take place that is in violation of Section 504 of the Rehabilitation Act or its anti-retaliation provisions.

Plaintiff has no plain, speedy or adequate remedy at law other then injunctive relief so as to prevent further damage to Plaintiff's career and his well-being.

## IV. EVIDENTIARY PROBLEMS

1) Plaintiff awaits Opposing Counsel Robin Dal Soglio's response to his second Request for Documents. The response is several months overdue, despite numerous promises by Dal Soglio to locate and serve the response. Furthermore, because the discovery deadline is expired, Plaintiff requests pre-emptive direction from the court that this forthcoming response — when served – does not contain frivolous objections; Plaintiff requests critical documents that he is entitled to: his own student record, his positive performance reviews, and the dialogue between NIH Headquarters and USC which forwarded his lawsuit-related email; certified email tracking proves that such dialogue occurred in the days before the retaliatory processes began at Keck.

2) Three former individual defendants and key witnesses (Baughman, Henderson, and Katsufrakis) have all resigned and/or been excused from their respective posts at the NIH/USC. Plaintiff will need assistance and cooperation with opposing counsel in order to communicate with these regarding trial dates and notification requirements.

## V. JURY TRIAL

Timely demand for Jury Trial has been made by the Plaintiff.

## VI. STATEMENT OF DAMAGES

As a direct and proximate result of the wrongful acts and/or omissions of the Defendant, as set forth above, Plaintiff has sustained the following injuries and damages:

    a.    Severe emotional distress, humiliation, fear, and embarrassment;

    b.    Loss of career opportunity; and

-22-

1    c.    Past and future medical expenses including those for treatment of medical and dental

2 conditions related to the stress inflicted upon Plaintiff.

3        WHEREFORE, the Plaintiff prays for damages as follows:

4    a.    That this Court declare the rights of all parties;

5    b.    Compensatory damages, including, but not limited to general and special damages,

6 amounting to $1,850,000;

7    c.    Exemplary and punitive damages of $400,000;

8    d.    Costs of suit incurred herein

9    e.    That this Court issue a permanent injunction, all enjoining and restraining Defendants,

10 and each of them, from violating Plaintiff's aforementioned legal rights; and

11    f.    All other compensatory, equitable and declaratory relief as this Court deems just.

12

13 Respectfully submitted, this 4th day of February, 2008.

14

15

16

17

18 JEFFREY DAVID ISAACS

19    Plaintiff, *pro se*

20

21

22

23

24

25

26

27

28

-23-

1

2                           **CERTIFICATE OF SERVICE**

3

4          I hereby certify that the following document

5

6      -    PLAINTIFF'S CONTENTIONS OF FACT AND LAW

7

8          was   served   upon   the   represented   parties,   by   CERTIFIED   ELECTRONIC   MAIL   AS

9      STIPULATED BY THE PARTIES, by e-mailing copies thereof to:

10

11     Robin D. Dal Soglio
       27240 Turnberry Lane, Suite 200
12     Valencia, California 91355

13

14

15     On this 4ᵗʰ day of February, 2008

16

17                                             JEFFREY DAVID ISAACS
                                               Plaintiff, *pro se*
18                                             3553 West Chester Pike
                                               PMB #177
19                                             Newtown Square, PA 19073
                                               Telephone: (215) 609-4625
20                                             Facsimile: (310) 564-0432
                                               Email: jdi@alum.dartmouth.org
21

22

23

24

25

26

27

28

                                             -24-

                  PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW
       No. CV-06-3338 GAF (Ex)