DAL SOGLIO & MARTENS LLP
Robin D. Dal Soglio (State Bar No. 155334)
27240 Turnberry Lane, Suite 200
Valencia, California 91355
Telephone: (661) 362-0736
Facsimile: (661) 244-4942
E-mail: rdalsoglio@dm-lawfirm.com

Attorneys for Defendants University of Southern California, Robert Baughman, Brian E. Henderson, Peter J. Katsufrakis and James M.H. Ball

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEFFREY DAVID ISAACS,<br><br>Plaintiff,<br><br>v.<br><br>UNIVERSITY OF SOUTHERN CALIFORNIA; ROBERT WILLIAM BAUGHMAN; BRIAN E. HENDERSON; PETER J. KATSUFRAKIS; and JAMES M.H. BALL<br><br>Defendants. | CASE NO. CV-06-3338 GAF (Ex)<br><br>**STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF DEFENDANT UNIVERSITY OF SOUTHERN CALIFORNIA'S MOTION FOR SUMMARY JUDGMENT**<br><br>[Filed Concurrently Herewith: Notice of Motion and Motion for Summary Judgment and Memorandum of Points and Authorities; Declaration of Peter J. Katsufrakis; Declaration of Amy Baughman; Request for Judicial Notice; Proposed Judgment]<br><br>Date: April 21, 2008<br>Time: 9:30 a.m.<br>Courtroom: 740 – Roybal<br>Hon. Gary A. Feess |

# I.

## **UNCONTROVERTED FACTS**

After consideration of the papers in support of and in opposition to Defendant's Motion for Summary Judgment or, in the alternative, Partial Summary Judgment, and the oral argument of counsel and Plaintiff *in pro per*, the Court determines that the following facts have been established as uncontroverted:

1. Plaintiff began medical studies at USC in August 2005. (Plaintiff's Second Amended Complaint ("SAC"), ¶¶ 3, 9.)

2. Approximately halfway through Plaintiff's first semester at school, Plaintiff alleges that other students, including Amy Baughman, began harassing him. (SAC, ¶ 10.)

3. Plaintiff maintains that he "explained to Ms. Baughman that he suffered from a certain psychiatric condition that she exacerbated." (SAC, ¶ 13.)

4. On November 18, 2005, following an interaction in which Ms. Baughman made what Plaintiff viewed as an "unfeasible" request to stay away from her, Plaintiff proceeded to send over 60 text messages to Ms. Baughman between 3:00 p.m. and midnight, including one message discussing Ms. Baughman's alleged STD infection, a message chastising Ms. Baughman and her friends for their supposed drug use, and another message sarcastically quoting Ms. Baughman. (SAC, ¶14; Declaration of Amy Baughman ("Baughman Decl."), ¶¶ 2-3 and Exh. A thereto.)

5. On November 21, 2005, Ms. Baughman complained to Peter Katsufrakis, the medical school's Associate Dean of Students, about Plaintiff's disturbing repeated phone calls, email messages and "30-60 text messages including one that said 'wanna f**k.'" Ms. Baughman informed Katsufrakis that Plaintiff's "behavior in recent days has been inappropriate towards me and has

///
///

made me very, very uncomfortable." (Baughman Decl., ¶ 4 and Exh. B thereto; Declaration of Peter J. Katsufrakis ("Katsufrakis Decl."), ¶¶ 2 and 3, Exhs. A and B thereto.)

6. Defendant Katsufrakis met with Plaintiff and Ms. Baughman on November 23, 2005. (Katsufrakis Decl., ¶4.)

7. Defendant Katsufrakis asked Plaintiff to voluntarily accept a school stay-away order between him and Ms. Baughman, but Plaintiff refused. (Katsufrakis Decl., ¶4 and Exh. B thereto; SAC, ¶15.)

8. Defendant Katsufrakis continued to monitor the situation, meeting with Plaintiff on November 30, 2005 and suggesting that he consider counseling. (Katsufrakis Decl., ¶5 and Exh. B thereto.)

9. Plaintiff left a message for Ms. Baughman on December 2, 2005 wishing to talk with her. (Katsufrakis Decl., ¶6 and Exh. C thereto.)

10. Ms. Baughman immediately emailed Katsufrakis, informing him that she did not want "any more involvement" with Plaintiff. (Katsufrakis Decl., ¶6 and Exh. C thereto.)

11. Later that same day, she emailed Katsufrakis again stating that she had received a third voicemail from Plaintiff that day and telling Katsufrakis "I don't think he understands how intensely I want him to leave me alone." (Katsufrakis Decl., ¶6 and Exh. C thereto.)

12. Ms. Baughman sent an email to Plaintiff on December 4, 2005 explaining that she was "so reluctant" to have any communication with him because, as she explained to him: "You sent me over 50 messages and nonstop called me for several hours. You feel you have a justified explanation for this. But in my mind, there is no justification for such behavior. It scared and upset me…. I just feel that distance would be a good way to let things simmer down and move on asap until January." In the email, she informed Plaintiff that "distance would be a good way to let things simmer and move on asap until January" and that she

needed to focus on studying for exams. (Baughman Decl., ¶5 and Exh. C thereto; Katsufrakis Decl., ¶7 and Exh. D thereto.)

13. On December 6, 2005, Katsufrakis spoke again with Plaintiff, who was upset by a classmate he believed was laughing about his conflict with Ms. Baughman. At that time, Katsufrakis reiterated his recommendation for Plaintiff to receive counseling. (Katsufrakis Decl., ¶8.)

14. Ms. Baughman sent another email on December 16, 2005 stating in no uncertain terms that: "I told you before Thanksgiving that I wanted no contact from you. I told you first in person outside the library, in a text message later that afternoon, and then through Dr. K, and that [sic] again, at our meeting with Dr. K. . . . I will spell it out here. I do not want to receive any more mail, phone or text contact from you. I do not want any further 'explanations' from you. . . . I need you to leave me alone." (Baughman Decl., ¶5 and Exh. C thereto; Katsufrakis Decl., ¶9 and Exh. E thereto)

15. Plaintiff contacted Ms. Baughman during their winter break from USC, sending e-mail messages on December 24 and 28, 2005 and one on December 30, 2005 stating "it really hurts that you didn't respond at all over break," and, ominously: "There is little I would not do to be on better terms with you." (Baughman Decl., ¶6 and Exh. D thereto; Katsufrakis Decl., ¶10 and Exh. F thereto.)

16. Upon his return to Los Angeles, Plaintiff sent another email on January 5, 2006 asking Ms. Baughman to meet with him because it is "continually painful" to be "sitting in a room with someone who said they want nothing to do with me." (Baughman Decl., ¶7 and Exh. E thereto; Katsufrakis Decl., ¶11 and Exh. G thereto.)

///
///
///

17. Plaintiff emailed Ms. Baughman the next day, January 6, 2006, to criticize her for forwarding his email to another classmate, and then sent multiple messages to her the following day, January 7, 2006. (Baughman Decl., ¶8 and Exh. F thereto; Katsufrakis Decl., ¶12 and Exh. H thereto.)

18. One of the January 7 emails asked if Ms. Baughman wanted Plaintiff to drop out of school, which he said was "a pretty steep price to pay for being attracted to you," and another stated that he was having "nightmares about you. I am seriously considering dropping out, waiting for exam results but the bigger issue is you. I can't be around you for four years like this. I'm not one to beg, Amy, but in this case I am pleading with you to have a discussin [sic] with me or me and a friend." (Baughman Decl., ¶8 and Exh. F thereto; Katsufrakis Decl., ¶12 and Exh. H thereto.)

19. Also on January 7, 2006, Ms. Baughman received an email from the University Online Facebook informing her that Plaintiff was requesting to add her as a friend to his online Facebook. (Baughman Decl., ¶9 and Exh. G thereto.)

20. In an email sent on January 8, 2006, Plaintiff wrote to Ms. Baughman suggesting "a walk on the beach or something" and expressing his desire to talk with her "in private" and "on my terms." (Baughman Decl., ¶10 and Exh. H thereto; Katsufrakis Decl., ¶13 and Exh. I thereto.)

21. Based on Mr. Isaacs refusal to stop contacting and harassing her, Ms. Baughman made the decision to seek a University restraining order against Plaintiff. (Baughman Decl., ¶11.)

22. On Sunday, January 8, 2006, Ms. Baughman wrote Dr. Katsufrakis an e-mail informing him that she felt like Plaintiff was "stalking" her and that she would be filing for the restraining order the next day, Monday, January 9, 2006. (Baughman Decl., ¶11 and Exh. I thereto; Katsufrakis Decl., ¶13 and Exh. I thereto.)

23. The next morning, at 7:46 a.m. and 10:04 a.m., Dr. Katsufrakis responded to Ms. Baughman's email, approving of her plan and directing her to obtain the "Stay Away Letter" through the University's Center for Women and Men. (Baughman Decl., ¶12 and Exh. J thereto.)

24. That same day, January 9, 2006, Ms. Baughman made a report to the Center for Women and Men and requested that they issue a Stay Away Letter to Plaintiff. (Baughman Decl., ¶13.)

25. Later that afternoon, after Plaintiff had already filed for the Stay Away Order, Plaintiff sent Ms. Baughman an email, angrily asking Ms. Baughman if she was going to reply to him or just keep forwarding his e-mails to others. (Baughman Decl., ¶14 and Exh. K thereto; Katsufrakis Decl., ¶14 and Exh. J thereto.)

26. Then, at 1:59 p.m., Plaintiff sent Ms. Baughman another email announcing that he did not attend class that day because he was preparing a lawsuit against her, which he would serve on her and her father if she did not agree to meet with him during the following week. (Baughman Decl., ¶14 and Exh. K thereto; Katsufrakis Decl., ¶14 and Exh. J thereto.)

27. Ms. Baughman was extremely frightened by these events, and her father sent a message to defendant Katsufrakis stating his intention to fly to Los Angeles to see her and discuss what should be done. (Katsufrakis Decl., ¶15 and Exh. K thereto.)

28. On January 10, 2006, USC served Plaintiff with the Stay-Away Order. (SAC, ¶20; Baughman Decl., ¶15 and Exh. L thereto; Katsufrakis Decl., ¶16 and Exh. L thereto.)

29. Plaintiff did not, however, stay away from Amy Baughman. To the contrary, after failing a hematology exam, Plaintiff sent bizarre, rambling emails to Ms. Baughman on February 17 and 19, 2006 apologizing for "my inappropriate actions" and stating that "I honestly believe I fell in love with you"

and that "I did it because of the strongest feelings for you." (Baughman Decl., ¶¶ 16 and 17 and Exhs. M and N thereto; Katsufrakis Decl., ¶17 and Exh. M thereto.)

30. A disciplinary hearing concerning Plaintiff was held on February 27, 2006 before the Student Performance Committee ("SPC"). (Katsufrakis Decl., ¶18; SAC, ¶31.)

31. Plaintiff appeared at the hearing and did not contest most of the allegations against him, including that he violated the Stay Away Order in contacting Baughman. (Katsufrakis Decl., ¶18; SAC, ¶31.)

32. On March 2, 2006, Ms. Baughman sent an email to Dr. Katsufrakis and other University administrators and faculty informing them that on February 28, 2006, Plaintiff had come rushing into one of her labs to tell her that he was being expelled. Ms. Baughman relayed that Plaintiff accused her of creating a conspiracy to get him suspended and that he said she was ruining his life. She stated in her email that Plaintiff had acted crazy and that he scared her. Finally, she stated that, at that point, she became gravely concerned about her own safety. Dr. Katsufrakis responded to Ms. Baughman that same day informing her that Plaintiff Mr. Isaacs had been told that he was no longer permitted on campus. (Baughman Decl., ¶18 and Exh. O thereto.)

33. On March 1, 1006, Katsufrakis sent a letter to Plaintiff notifying him that the SPC had voted to suspend him and that he would be considered for dismissal at an upcoming SPC meeting in accordance with the rules set forth in the Student Handbook. (Katsufrakis Decl., ¶18 and Exh. N thereto; SAC, ¶33.)

34. Plaintiff then checked himself into the UCLA Emergency Room where he was hospitalized at the neuro-psychiatric hospital for approximately one month. (SAC, ¶35.)

35. On March 17, 2006, University officials received a notice from Plaintiff's treating physician at UCLA pursuant to Tarasoff v. Regents of the

University of California, 17 Cal. 3d 425, 131 Cal. Rptr. 14 (1976) that Plaintiff had made the following violent statements: "I don't think they'll dismiss me because they're afraid I'll come in with a gun," and "You have no idea how dangerous I'll become." (Katsufrakis Decl., ¶20 and Ex. P thereto.)

36. Following his release from UCLA, Plaintiff began treatment with another doctor, who sent a letter to USC requesting "retroactive leave of absence, in lieu of the discriminatory suspension" and suggesting "that USC offer support and counseling services to Plaintiff," rather than punishing him. (SAC, ¶36.)

37. USC denied the request for retroactive medical leave and, on June 7, 2006, a dismissal hearing was held pursuant to the University's policy on Academic Probation and Dismissal. (Katsufrakis Decl., ¶21.)

38. Significantly, at this hearing, Plaintiff was represented by an attorney, who submitted a written statement and also presented witness testimony on Plaintiff's behalf. (Katsufrakis Decl., ¶21.)

39. On June 8, 2006, Plaintiff was notified that the SPC voted to dismiss him from the medical school for behavior that was not consistent with the essential characteristics and abilities required for completion of the M.D. degree at the Keck School of Medicine. (Katsufrakis Decl., ¶¶21-22 and Exhs. Q and R thereto; SAC, ¶¶40-41.)

40. These stated essential characteristics and abilities include "sufficient mental stability to provide reasonable assurance that candidates can complete the entire course of study and participate fully in all aspects of medical training." (Katsufrakis Decl., ¶22 and Ex. R thereto.)

41. Plaintiff, through his attorney, appealed the SPC decision expelling him, which was reviewed – and upheld – in accordance with University procedures by an *ad hoc* committee of faculty members who had no prior involvement in the dismissal decision. (Katsufrakis Decl., ¶¶19, 23, and Ex. O.)

...

## II.

## CONCLUSIONS OF LAW

Based on the foregoing Uncontroverted Facts, the Court now makes the following conclusions of law:

1. Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

2. The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

3. The moving party, however, has no burden to negate or disprove matters on which the non-moving party will have the burden of proof at trial. The moving party need only point out to the court that there is an absence of evidence to support the non-moving party's case. Celotex at 325.

4. The burden then shifts to the non-moving party to "designate specific facts showing that there is a genuine issue for trial." Id. at 324 (quoting Fed. R. Civ. P. 56(e)).

5. To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

6. "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

///
///

## PLAINTIFF'S FIRST AND FOURTH CLAIMS FOR RETALIATION UNDER SECTION 504 AND THE ADA FAIL AS A MATTER OF LAW

7. In order to establish a *prima facie* case against USC for retaliation under Section 504 or the ADA, Plaintiff must show that (1) he engaged in a protected activity; (2) USC knew he was involved in the protected activity; (3) an adverse action was taken against him; and (4) a causal connection exists between the protected activity and the adverse action. *See, e.g.*, Alex G. ex rel. Dr. Steven G. v. Bd. of Trustees of Davis Joint Unified Sch. Dist., 387 F. Supp. 2d 1119, 1128 (E.D. Cal. 2005) (*citing* Weixel v. Bd. of Educ., 287 F.3d 138, 148 (2d Cir. 2002)).

8. Plaintiff has no evidence establishing a causal connection between his supposedly protected activities of informing USC of a Post Traumatic Stress Disorder ("PTSD") condition, requesting a retroactive medical leave of absence and filing this lawsuit, on the one hand, and his ultimate dismissal from the medical school, on the other hand.

9. Even assuming *arguendo* that Plaintiff could establish such a connection, his claims still fail because he has no evidence of pretext.

10. If the plaintiff is relying solely on indirect or circumstantial evidence of pretext, then the evidence must be "specific" and "substantial" to survive summary judgment.

11. As in LaVine v. Blaine Sch. Dist., 257 F. 3d 981, 987 (9th Cir. 2001), "This case arises against a backdrop of tragic school shootings, occurring both before and after the events at issue here, and requires [the Court] to evaluate through a constitutional prism the actions school officials took to address what they perceived was the student's implied threat of violent harm to himself and others." Here, the University's actions must be evaluated in this same light.

/ / /

/ / /

12. Incidents of school violence have further escalated since the Ninth Circuit's decision in LaVine – indeed, even further since Plaintiff's dismissal in 2006 (*see* Defendants' Request for Judicial Notice) – only confirming the necessity for prompt and effective action when threats are made in an educational setting.

13. The evidence establishes that the actions taken in this case by USC administrators were taken in order to protect the well being of students and faculty.

14. This basis constitutes – as a matter of law – a legitimate non-retaliatory reason for USC's decision to expel Plaintiff.

15. In order to survive summary judgment, Plaintiff would have to come forward with *specific* evidence which establishes that the University's concerns for campus safety were a mere pretext to retaliate against him. In the day and age in which we currently live, this he has not done and cannot do.

16. As such, summary judgment is granted on Plaintiff's first and fourth claims.

## PLAINTIFF'S SECOND AND THIRD CLAIMS FOR DISCRIMINATION UNDER SECTION 504 FAIL AS A MATTER OF LAW

17. To establish a *prima facie* case of discrimination under Section 504 or the ADA, Plaintiff must show that: (1) he is disabled; (2) he is "otherwise qualified" to remain a student at the medical school; (3) he was dismissed solely because of his disability; and (4) the medical school receives federal financial assistance (Section 504 claim) or is a public entity (ADA claim). *See* Wong v. Regents of the Univ. of Cal., 192 F.3d 807, 816 (9th Cir. 1999); Zukle v. Regents of the Univ. of Cal., *supra*, 166 F.3d at 1045.

///
///

18. The Ninth Circuit in <u>Zukle</u> affirmed summary judgment in favor of a defendant medical school that dismissed a learning disabled student for failure to meet the school's academic standards. <u>Id</u>. at 1051 (holding plaintiff failed to demonstrate that she was "otherwise qualified" and could meet the essential eligibility requirements of the medical school).

19. Applying the shifting burden approach to require the plaintiff to produce evidence of the existence of a reasonable accommodation that would enable her to meet the school's essential eligibility requirements, the <u>Zukle</u> court determined that Zukle was not an "otherwise qualified" individual with a disability and denied her request to proceed with her medical schooling on a decelerated schedule due to her reading disability. <u>Zukle</u>, at 1047. Although it had granted accommodation requests for decelerated schedules in the past – including for Zukle herself – the court noted that it "must evaluate Zukle's requests in light of the totality of her circumstances." <u>Id</u>. at 1048 (citations omitted).

20. Academic decisions made by a school in the context of an ADA or Section 504 claim must be accorded deference. <u>Zukle</u>, at 1047-48 ("[W]e will extend judicial deference 'to the evaluation made by the institution itself, absent proof that its standards and its application of them *serve no purpose other than to deny an education to handicapped persons*.'" (*quoting* <u>Doe v. New York Univ.</u>, 666 F.2d 761, 776 (2nd Cir. 1981) (emphasis supplied).)

21. Indeed, Courts have been particularly reluctant to second-guess academic decisions regarding the program and standards applicable to medical students, since "the conferral of a degree places the school's imprimatur" upon the individual as someone qualified to pursue a physician's license. <u>Kaltenberger v. Ohio College of Podiatric Med.</u>, 162 F.3d 432, 437 (6th Cir. 1998).

22. This deference is particularly warranted for decisions involving school safety. Indeed, even where a fundamental right is implicated, the court reviews "with deference, schools' decision in connection with safety of their

students." LaVine, *supra*, 257 F.3d at 992 (upholding school officials' decision to expel student based on violent poem, even though student's right to freedom of expression implicated).

23. Under this deferential standard, lower courts have upheld school administrators' efforts to regulate even off-campus conduct based on safety concerns. *See* Cohn v. New Paltz Central Sch. Dist., 363 F. Supp. 2d 421, 434 (N.D.N.Y. 2005) (denying substantive due process challenge to school's expulsion based on student's possession of a handgun off school property); *see also* Doe v. Mercer Island Sch. Dist. No. 400, 2007 U.S. Dist. LEXIS 5890 (W.D. Wash. Jan. 26, 2007) (court declined to "substitute its own judgment . . . in determining how to make schools safe in an era of increasing school violence," refusing to second-guess the school administration's decision absent evidence that it "shock[ed] the conscience") (*quoting* Brittain v. Hansen, 451 F.3d 982, 991 (9th Cir. 2006)).

24. Here, the University's decisions were utterly reasonable and similarly should not be disturbed.

25. USC dismissed Plaintiff in response to his violation of school rules, including stalking a fellow classmate, violating a Stay Away Order, and making potential threats of violence.

26. USC determined in its reasonable judgment that Plaintiff was not equipped with the "essential characteristics and abilities required for completion of the M.D. Degree" at the Keck School of Medicine.

27. Based upon all of the circumstances, USC denied Plaintiff's request for retroactive leave and made the academic and safety related decision to dismiss him. Particularly given the current atmosphere at our country's educational institutions, this reasonable decision should be accorded deference and upheld.

///

///

28.  Therefore, Plaintiff is not "otherwise qualified" to remain at USC medical school and, as such, has not stated a *prima facie* case of discrimination under Section 504 or the ADA.

29.  Even if he were to make a *prima facie* showing of Section 504/ADA discrimination, Plaintiff's claims still must be dismissed because he cannot establish that he was expelled *solely* on the basis of an alleged psychiatric condition.

30.  The current climate at educational institutions nationwide compels administrators to take action in cases such as this one. *See* Defendants' Request for Judicial Notice; LaVine, *supra*, 257 F.3d at 987.

31.  USC officials were in no position to ignore or even take a "wait and see" approach to Plaintiff's disturbing behavior and threats.

32.  As a matter of law, Plaintiff cannot demonstrate that USC's decision to dismiss him was wholly motivated by a desire to discriminate on the basis of his alleged mental disability.

33.  As such, summary judgment is granted on Plaintiff's second and third claims.

## SUMMARY JUDGMENT SHOULD BE GRANTED AS TO PLAINTIFF'S SIXTH CLAIM FOR BREACH OF CONTRACT

34.  Because Plaintiff's contract claim is "intertwined" with his discrimination claims (3/2/07 Minute Order at 12.) and because Plaintiff's discrimination claims fail as set forth in detail above, summary judgment is warranted on his contract claim as well.

35.  Moreover, Plaintiff has no evidence of any alleged breach.

36.  A breach of contract claim is comprised of the following elements: (1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to plaintiff.

*See, e.g.,* <u>Careau & Co. v. Security Pacific Business Credit, Inc.</u>, 222 Cal. App. 3d 1371, 1388, 272 Cal. Rptr. 387 (1990).

37. Plaintiff alleges that his "contractual relationship" with USC included "all bulletins, regulations, policies and accreditation standards." (SAC, ¶65.)

38. While Plaintiff alleges that USC violated "numerous LCME accreditation standards and other contractual rights," the only specifics he provides are the supposed University policies and LCME[1] accreditation standards set forth in Exhibit L to his SAC: (1) USC's policy prohibiting retaliation and (2) the LCME standards forbidding financial or political influence in the selection of students, and requiring medical schools to uphold scrupulous ethical principles in its students. (SAC, ¶66, Ex. L thereto.)

39. As set forth above, USC did not retaliate against Plaintiff as a matter of law. Therefore, the University did not breach any policy prohibiting retaliation.

40. In addition, Plaintiff cannot establish any contractual breach based upon LCME standards. Exhibit L to Plaintiff's SAC, a Petition he submitted after his dismissal from USC to "formally document numerous violations [he] personally witnessed and suffered during the course of his studies," is rife with vague assertions about a group of "morally deficient" classmates whose infractions he maintains that the University was "mandated to correct." (SAC, Exhibit L at 1.)

41. Even if Plaintiff had facts to support his conclusory claims about the alleged misdeeds of his peers – which he does not – this has nothing to do with whether USC breached any contractual obligation when it expelled him.

---

[1] The Liaison Committee on Medical Education ("LCME") is the accrediting authority for medical education programs leading to the M.D. degree in U.S. medical schools.

42. USC followed established policies and procedures throughout the disciplinary process that led to Plaintiff's dismissal.

43. USC adhered to the standards on Academic Probation and Dismissal set forth in the Student Handbook, including providing Plaintiff with notice and an opportunity to be heard. Indeed, Plaintiff was represented at his dismissal hearing by an attorney, who presented written evidence and witnesses to testify on Plaintiff's behalf. After his dismissal, in accordance with University policy, the decision was reviewed and upheld by an independent *ad hoc* committee comprised of faculty members who were not involved even remotely in the decision to dismiss.

44. Because Plaintiff can show no breach of any contract, judgment is granted on his sixth claim for relief.

## SUMMARY JUDGMENT SHOULD BE GRANTED ON PLAINTIFF'S TENTH CLAIM FOR INJUNCTIVE RELIEF

45. Because Plaintiff's claims are without merit as set forth in detail above, there is no basis to grant him any injunctive relief.

46. Accordingly, summary judgment on this claim is warranted as well.

Dated: _____     _____
                          Hon. Gary A. Feess
                          Judge, United States District Court

# **PROOF OF SERVICE**

STATE OF CALIFORNIA )
COUNTY OF LOS ANGELES )

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is 27240 Turnberry Lane, Suite 200, Valencia, CA 91355.

On March 28, 2008, I caused to be served the foregoing documents described as:

**STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF DEFENDANT UNIVERSITY OF SOUTHERN CALIFORNIA'S MOTION FOR SUMMARY JUDGMENT**

on the person listed as follows:

Jeffrey David Isaacs
3553 West Chester Pike
PMB #177
Newtown Square, PA 19073

☒ (BY MAIL) I enclosed the documents in a sealed envelope addressed to the persons above and placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with this firm's practice for collecting and processing correspondence for mailing. It is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid at our firm's office address in Valencia, California. Service made pursuant to this paragraph shall be presumed invalid if the postal cancellation date on the envelope is more than one day after the date of deposit for mailing contained in this affidavit.

Executed on March 28, 2008 in Valencia, California.

I declare under penalty of perjury under the laws of the state of California that the above is true and correct.

| **Robin Fink** | |
|---|---|
| **Type or Print Name** | **Signature** |