1  DAL SOGLIO & MARTENS LLP
       Robin D. Dal Soglio (State Bar No. 155334)
2  27240 Turnberry Lane, Suite 200
3  Valencia, California  91355
   Telephone:  (661) 362-0736
4  Facsimile:   (661) 244-4942
   E-mail:  rdalsoglio@dm-lawfirm.com
5

6  Attorneys for Defendants University of
7  Southern California, Robert Baughman, Brian
   E. Henderson, Peter J. Katsufrakis and James
8  M.H. Ball

9

10              UNITED STATES DISTRICT COURT
11              CENTRAL DISTRICT OF CALIFORNIA

12

13  JEFFREY DAVID ISAACS,            |  CASE NO. CV-06-3338 GAF (Ex)

14              Mr. Isaacs,          |  **DECLARATION OF PETER J.**
                                     |  **KATSUFRAKIS IN SUPPORT OF**
15       v.                          |  **DEFENDANT'S MOTION FOR**
                                     |  **SUMMARY JUDGMENT, OR, IN**
16                                   |  **THE ALTERNATIVE, PARTIAL**
17  UNIVERSITY OF SOUTHERN           |  **SUMMARY JUDGMENT**
    CALIFORNIA; ROBERT WILLIAM       |
18  BAUGHMAN; BRIAN E.               |  Date:        April 21, 2008
    HENDERSON; PETER J.              |  Time:        9:30 a.m.
19  KATSUFRAKIS; and JAMES M.H.      |  Courtroom:   740 – Roybal
20  BALL                            |               Hon. Gary A. Feess
21              Defendants.          |
22                                   |  [Filed Concurrently Herewith:
                                     |  Defendant's Notice of Motion and Motion
23                                   |  for Summary Judgment, Points and
24                                   |  Authorities in Support Thereof; Statement
                                     |  of Uncontroverted Facts and Conclusions
25                                   |  of Law; Declaration of Amy Baughman;
26                                   |  Request for Judicial Notice;
                                     |  Proposed Judgment]
27

28

## DECLARATION OF PETER J. KATSUFRAKIS

I, Peter J. Kastufrakis, declare as follows:

1.    From July 1, 1993 to June 14, 2007, I was the Associate Dean for Student Affairs at the Keck School of Medicine of the University of Southern California.    In that capacity, I handled direction and execution of all aspects of the Office of Student Affairs of the Keck School of Medicine, including serving as chair of the Student Performance Committee.    I am familiar with the rules and procedures which governed the students at the Keck School of Medicine during my employment there, including those set forth in the Student Handbook.

2.    On or about November 21, 2005, I received an email from a first year Keck medical student named Amy Baughman informing me that she had "ended up in a situation with another student that has gotten out of hand.    His behavior in recent days has been inappropriate towards me and has made me very, very uncomfortable."    A true and correct copy of this email dated November 21, 2005 is attached hereto as Exhibit A.

3.    When I spoke with Ms. Baughman on or about November 21, 2005, I learned that one of her classmates, Jeffrey David Isaacs, was harassing her with repeated phone calls, email messages and "30-60 text messages including one that said 'wanna f**k.'"    In my meeting with her that day, she showed me her cell phone which contained this message and others.    In connection with a meeting of the Student Performance Committee ("SPC") in February 2006 (see paragraph 18 below), I prepared a chronology of events that references this meeting with Ms. Baughman and what we discussed.    A true and correct copy of this chronology is attached hereto as Exhibit B.

4.    I arranged a meeting between myself, Ms. Baughman and Mr. Isaacs on November 23, 2005.    At that meeting, I asked Mr. Isaacs to voluntarily accept a school stay-away order between him and Ms. Baughman, but he refused. The chronology of events I prepared in connection with a meeting of the SPC in

Declaration of Peter J. Katsufrakis in support
of Defendant's Motion for Summary Judgment

1  February 2006 references this meeting with Ms. Baughman and Mr. Isaacs and
2  what we discussed.  *See* Exhibit B.

3          5.      I continued to monitor the situation and met again with Mr.
4  Isaacs on November 30, 2005, at which time I suggested that he consider
5  counseling.  The chronology of events I prepared in connection with a meeting of
6  the SPC in February 2006 references this meeting with Ms. Baughman and Mr.
7  Isaacs and what we discussed.  *See* Exhibit B.

8          6.      Ms. Baughman emailed me on December 2, 2005 and informed
9  me that Mr. Isaacs had left her a message stating that he wished to talk with her,
10 and that she intended to ignore his message because she did not want "any more
11 involvement with him."  She emailed me again later in the afternoon stating that
12 she had received a third voicemail from him and that "I don't think he understands
13 how intensely I want him to leave me alone."  True and correct copies of these
14 December 2, 2005 emails are attached hereto as Exhibit C.

15         7.      Ms. Baughman sent an email to Mr. Isaacs on December 4,
16 2005 explaining that she was "so reluctant" to have any communication with him
17 because "You sent me over 50 messages and nonstop called me for several hours.
18 You feel you have a justified explanation for this.  But in my mind, there is no
19 justification for such behavior.  It scared and upset me."  In the email, she
20 informed Mr. Isaacs that "distance would be a good way to let things simmer and
21 move on asap until January" and that she needed to focus on studying for exams.
22 A true and correct copy of this December 4, 2005 email is attached hereto as
23 Exhibit D.

24         8.      On December 6, 2005, I spoke again with Mr. Isaacs, who
25 stated that he was upset by a classmate he believed was laughing about his conflict
26 with Ms. Baughman.  I reiterated my recommendation for counseling to Mr. Isaacs
27 at that time.   The chronology of events I prepared in connection with the SPC
28 meeting in February references this discussion with Mr. Isaacs. *See* Exhibit B.

1        9.    Ms. Baughman sent an email to Mr. Isaacs on December 16,

2   2005 stating, among other things, that: "I told you before Thanksgiving that I

3   wanted no contact from you.  I told you first in person outside the library, in a text

4   message later that afternoon, and then through Dr. K, and that [sic] again, at our

5   meeting with Dr. K. . . . I will spell it out here.  I do not want to receive any more

6   mail, phone or text contact from you.  I do not want any further 'explanations'

7   from you. . . . I need you to leave me alone."   A true and correct copy of this

8   December 16, 2005 email provided to me by Ms. Baughman is attached hereto as

9   Exhibit E.

10        10.    Despite her December 16, 2005 email, Mr. Isaacs contacted Ms.

11   Baughman on several occasions during their winter break from USC.  He sent

12   lengthy messages to her on December 24 and 28, 2005 and one on December 30,

13   2005 stating "it really hurts that you didn't respond at all over break," and,

14   ominously: "There is little I would not do to be on better terms with you." True and

15   correct copies of these emails dated December 24, 28 and 30, 2005 provided to me

16   by Ms. Baughman are attached hereto as Exhibit F.

17        11.    Upon his return to Los Angeles, Mr. Isaacs sent another email

18   on January 5, 2006 asking Ms. Baughman to meet with him and his friend because

19   it is "continually painful" to be "sitting in a room with someone who said they

20   want nothing to do with me."  A true and correct copy of this January 5, 2006

21   email provided to me by Ms. Baughman is attached hereto as Exhibit G.

22        12.    Mr. Isaacs emailed Ms. Baughman the next day to criticize her

23   for forwarding his email to another classmate, and then sent multiple messages to

24   her the following day, January 7, 2006.  One of these emails asked if she wanted

25   him to drop out of school, which he said was "a pretty steep price to pay for being

26   attracted to you," and another stated that he was having "nightmares" about her.

27   He stated: "I am seriously considering dropping out, waiting for exam results but

28   the bigger issue is you.  I can't be around you for four years like this.  I'm not one

3    Declaration of Peter J. Katsufrakis in support of
Defendant's Motion for Summary Judgment

1   to beg, Amy, but in this case I am pleading with you to have a discussin [sic] with

2   me or me and a friend."   True and correct copies of these emails dated January 6

3   and 7, 2006 and provided to me by Ms. Baughman are attached hereto as

4   Exhibit H.

5          13.    In a January 8, 2006 email, Mr. Isaacs wrote to Ms. Baughman

6   suggesting "a walk on the beach or something" and expressing his desire to talk

7   with her "in private" and "on my terms."  That same day, January 8, 2006, Ms.

8   Baughman wrote me an e-mail informing me that she felt like Plaintiff was

9   "stalking" and stating that she would be filing for a University restraining order the

10  next day.  True and correct copies of Plaintiff's and Ms. Baughman's January 8,

11  2006 emails are attached hereto as Exhibit I.

12         14.    On January 9, 2006, Mr. Isaacs sent one email asking if Ms.

13  Baughman was going to reply to him and another email announcing that he did not

14  attend class that day because he was preparing a lawsuit against her, which he

15  would serve on her and her father if she did not agree to meet with him during the

16  following week.  True and correct copies of these January 9, 2006 emails provided

17  to me by Ms. Baughman are attached hereto as Exhibit J.

18         15.    On January 10, 2006, I received an email message from Ms.

19  Baughman's father, Robert Baughman, stating his concern for his daughter and his

20  intention to fly to Los Angeles to see her and discuss what should be done.  A true

21  and correct copy of this January 10, 2006 email is attached hereto as Exhibit K.

22         16.    On January 10, 2006, USC served Mr. Isaacs with a "stay away

23  order" requiring that he refrain from approaching or calling Ms. Baughman at any

24  time; sending anything to her via campus mail, regular mail, email or text message;

25  and contacting or communicating with her – including through a third party – at

26  any time.  A true and correct copy of this order is attached hereto as Exhibit L.

27  / / /

28  / / /

1        17.   In violation of the stay away order, Mr. Isaacs sent emails to

2 Ms. Baughman on February 17 and 19, 2006 apologizing for "my inappropriate

3 actions" and stating that "I honestly believe I fell in love with you" and that "I did

4 it because of the strongest feelings for you." True and correct copies of these

5 February 17 and 19, 2006 emails provided to me by Ms. Baughman are attached

6 hereto as Exhibit M.

7        18.   A disciplinary hearing concerning Mr. Isaacs was held on

8 February 27, 2006 before the SPC. Mr. Isaacs appeared at the hearing and did not

9 contest most of the allegations against him. On March 1, 2006, I sent a letter to

10 Mr. Isaacs documenting these facts and notifying him: (1) that the SPC had voted

11 to suspend him and (2) that he would be considered for dismissal at an upcoming

12 SPC meeting in accordance with the rules set forth in the Student Handbook. A

13 true and correct copy of my March 1, 2006 letter is attached hereto as Exhibit N.

14        19.   The standards on Academic Probation and Dismissal are set

15 forth in the Keck School of Medicine Student Handbook. A true and correct copy

16 of these standards is attached hereto as Exhibit O.

17        20.   On March 17, 2006, I received a telephone call from a Dr.

18 Clayton Bullock, the psychiatrist treating Mr. Isaacs at UCLA Neuropsychiatric

19 Institute. Dr. Bullock told me that he felt obligated to notify me under the <u>Tarasoff</u>

20 decision that Mr. Isaacs had made the following statements: "I don't think they'll

21 dismiss me because they're afraid I'll come in with a gun," and "You have no idea

22 how dangerous I'll become." I immediately sent an email entitled <u>Tarasoff</u>

23 warning to relay this information to several University administrators and faculty

24 members who had been involved in the proceedings related to Mr. Isaacs. A true

25 and correct copy of my March 17, 2006 email is attached hereto as Exhibit P.

26 / / /

27 / / /

28 / / /

   Declaration of Peter J. Katsufrakis in support of
Defendant's Motion for Summary Judgment

1         21.    On June 7, 2006, a dismissal hearing was held before the SPC

2  pursuant to the University's policy on Academic Probation and Dismissal.  At this

3  hearing, Mr. Isaacs was represented by counsel, who submitted a written statement

4  and presented witness testimony on Mr. Isaacs's behalf, and Mr. Isaacs was

5  allowed to speak to the Committee via teleconferencing.  On June 8, 2006, I sent

6  Mr. Isaacs (in care of his attorney), a letter informing him that after due

7  deliberation, the Committee had determined that he should be dismissed from the

8  medical school.  In that letter, I also notified Mr. Isaacs (through his counsel) of his

9  right to appeal the Committee's decision within ten working days of receipt of the

10  dismissal letter.  A true and correct copy of my June 8, 2006 is attached hereto as

11  Exhibit Q.

12        22.    In my June 8, 2006 letter to Mr. Isaacs, I explained that the

13  Committee had voted to dismiss him from the medical school "for behavior that

14  was not consistent with the essential characteristics and abilities required for

15  completion of the M.D. Degree at the Keck School of Medicine."  These stated

16  essential characteristics and abilities are included in the Student Handbook and

17  include "sufficient mental stability to provide reasonable assurance that candidates

18  can complete the entire course of study and participate fully in all aspects of

19  medical training."  A true and correct copy of the Essential Characteristics and

20  Abilities Required for Completion of the M.D. Degree at the Keck School of

21  Medicine is attached hereto as Exhibit R.

22        23.    On June 22, 2006, Mr. Isaacs, though his attorney, appealed the

23  SPC decision expelling him.  In accordance with University procedures, an *ad hoc*

24  committee of faculty members who had no prior involvement in the dismissal

25  decision was assembled.  After an independent review, the *ad hoc* committee

26  upheld the SPC's decision to expel Plaintiff from the medical school.

27  / / /

28  / / /

24.     Independent of these matters, I had initiated consideration of a career change in May 2005 when invited by a medical school in the Northeast to interview for a position as Senior Associate Dean; in early 2006 I decided not to pursue this opportunity following a change in the school's leadership.  I interviewed for a similar position at a Midwest medical school in the spring of 2006 and again determined not to pursue the position.  Sometime in the summer of 2006, I received notice of a new position at the National Board of Medical Examiners ("NBME") that seemed to be a good match for my experience and interests; in December 2006, I accepted the terms offered to me by the NBME and began my current position as Associate Vice President for Post-Graduate and Developmental Affairs on June 4, 2007.

Executed this 25th day of March, 2008 at Philadelphia, Pennsylvania.

Under the laws of the State of California and the United States of America, I certify that the foregoing declaration is true and correct.

_____

Peter J. Katsufrakis, M.D., M.B.A.

**EXHIBIT A**

From amy baughman <abaughma@usc.edu>

Sent Monday, November 21, 2005 12:34 am
To pkatsu@usc.edu
Subject meeting

Dr. Katsufrakis,

I have ended up in a situation with another student that has gotten out of hand. His behavior in recent days has been inappropriate towards me and has made me very, very uncomfortable. At the moment, things seem to have calmed down, but I'd like to speak with you in person about it as soon as possible. It's a rather sensitive issue and I'd prefer to not meet with you at your KAM office. I am fairly nervous about speaking with you and I suspect the other student invovied would be very upset if he knew.

Please let me know. Thank you.

Amy Baughman

cell phone: 617 823 0032

A - 8

**USC 0224**

**EXHIBIT**

**Chronology of Jeff Isaacs's actions and related events**
*Prepared for SPC February 27, 2006 meeting*

| Date | Notes |
|------|-------|
| 21-Nov | PJK approached by AB to complain about JI's actions. She reported that he had spoken with her on the preceding Friday, followed by repeated phone calls, email messages, and 30-60 text messages including one that said "wanna fuck." |
| | She reported that they had seen each other at different social events organized by other students, including parties and a trip to Mexico. She had been friendly with him, but subsequently his attention was unwanted. |
| | PJK met later in day with JI for 3 hours, who explained that he had been considering meeting because of his concern that AB was tarnishing his reputation. Reviewed events described by AB and offered his perspective. Agreed to joint meeting with AB. |
| 23-Nov | Met with AB and JI. AB expressed her wish not to communicate with JI until January 2006. JI unwilling to agree to limiting contact. AB said that if she felt threatened by JI she would talk with others, as this was her stress coping mechanism. JI explained that his refusal to limit contact was related to PTSD-like connection to past events; unwilling to elaborate re: events. Students were unable to reach a mutually acceptable agreement. Follow-up email from AB later that day reports JI spoke with her, very upset and tearful. |
| 25-Nov | Email from JI (copy in packet) explaining his wish for positive med school experience, acknowledges AB may not have fully appreciated his situation, expresses his wish to forgive & forget, and expresses concern about actions by and impact on classmates. |
| 30-Nov | In meeting with PJK, JI feels problems are improved, not resolved. Agrees to take no further action & allow resolution, unless new events arise. PJK recommends follow-up with a psychologist or counselor |
| 2-Dec | JI experiences increased anxiety following episode during MSP where AB left a group shortly after he arrived. JI referred to UPC (Student Conduct) if he wishes to file complaint; declined at present. |
| 2-Dec | JI leaves message for AB wishing to talk; she reports her intention to ignore it. |
| 4-Dec | AB communicates sympathy and wish for distance to JI via emails 12/4 & 12/14 (copy in packet) |
| 6-Dec | JI reports a classmate laughing about his conflict with AB. PJK reiterates recommendation for counseling. |
| 16-Dec | JI approaches AB after exams to talk; sends several emails over winter break. |
| 10-Jan | JI receives University "stay away" letter from Lynette Merriman. |
| 10-Jan | JI sends email message to AB and her father describing his intent to file a lawsuit against her. |
| 17-Jan | JI meets at PJK request to discuss JI's stress, potential need for psychiatric evaluation. JI reluctant because of concern that mental health care may provide evidence for future legal action. |
| 18-Jan | SPC reviews JI's performance and requests his attendance at next SPC meeting. |
| 17-Feb | JI sends email message to AB (copy in packet) and calls her. Explains his recent behavior in light of past events and apologizes for putting her through his sorting out. |

B-9

USC 0005

**EXHIBIT C**

From amy baughman <abaughma@usc.edu>
   Sent Friday, December 2, 2005 1:11 pm
      To Peter J Katsufrakis <pkatsu@usc.edu>
Subject jeff isaacs called me today
Hi Dr. K,

Jeff Isaacs just left me a message (1PM) asking to talk to me "because some issues have come up." He is trying to get in touch with you and I guess hasn't been able to and now wants to talk to me.

Since I have no idea what "the issue" is and do not want any more involvement with him, I'm going to go ahead and ignore the calls and any other contact from him. If you talk to him, please let him know this is how I feel. I am busy studying and would prefer not to be distracted/upset by this matter any further. However, please let me know if you think the three of us need to meet again. I will be at the library all afternoon.

Thanks a lot for trying to sort this out. I really appreciate it.

Best,
Amy

C-10

**USC 0228**

From amy baughman <abaughma@usc.edu>

Sent Friday, December 2, 2005 3:56 pm
   To Peter J Katsufrakis <pkatsu@usc.edu>
Subject Re: jeff isaacs called me today
Hi,

Just got a 3rd voicemail (3:50PM). He seems to think we need to meet before the weekend. I am not a fan of this. I won't be responding to his message. I don't think he understands how intensely I want him to leave me alone.

Amy

----- Original Message -----
From: Peter J Katsufrakis <pkatsu@usc.edu>
Date: Friday, December 2, 2005 2:56 pm
Subject: Re: jeff isaacs called me today
To: amy baughman <abaughma@usc.edu>

> Amy,
>
> Thanks for the information. I appreciate your willingness to meet
> again,
> if needed. I would hope to eliminate distractions to the extent
> possible
> until after exams, but if it seems we need to meet beforehand I'll
> let you
> know (or you let me know).
>
> PJK
>
>
>
> At 01:11 PM 12/2/2005 -0800, you wrote:
> >Hi Dr. K,
> >
> >Jeff Isaacs just left me a message (1PM) asking to talk to me
> "because
> >some issues have come up." He is trying to get in touch with you
> and I
> >guess hasn't been able to and now wants to talk to me.
> >
> >Since I have no idea what "the issue" is and do not want any more
> >involvement with him, I'm going to go ahead and ignore the calls
> and any
> >other contact from him. If you talk to him, please let him know
> this is
> >how I feel. I am busy studying and would prefer not to be
> >distracted/upset by this matter any further. However, please let
> me know
> >if you think the three of us need to meet again. I will be at the
> library
> >all afternoon.
> >
> >Thanks a lot for trying to sort this out. I really appreciate it.
> >
> >Best,
> >Amy
>
>
>

C - 11

USC 0229

**EXHIBIT D**

Jeffrey D. Isaacs 99, 04:46 PM 2/25/2006 -0500 Re: Personal letter for you.

Date: Sat, 25 Feb 2006 16:46:05 -0500 (EST)
From: Jeffrey.D.Isaacs.99@Alum.Dartmouth.ORG (Jeffrey D. Isaacs 99)
Subject: Re: Personal letter for you.
To: pkatsu@usc.edu
Reply-to: jeffrey.isaacs@alumni.insead.edu
X-Mailer: BlitzMail® version 2.6.3b27/blitzserv 3.14a4
X-MailScanner: Found to be clean by whoville.Dartmouth.ORG
X-MailScanner-From: jeffrey.d.isaacs.99@alum.dartmouth.org
Original-recipient: rfc822;pkatsu@usc.edu

--- Forwarded message from amy baughman ---
>Date: Sun, 04 Dec 2005 12:35:49 -0800
>From: amy baughman <abaughma@usc.edu>
>Subject: Re: Personal letter for you.
>In-reply-to: <49462047@newdoc.Dartmouth.ORG>
>To: "jdi@Alum.Dartmouth.ORG" <jdi@Alum.Dartmouth.ORG>
>Priority: normal
>References: <49462047@newdoc.Dartmouth.ORG>

Jeff,

I am really sorry to hear about Mr. Baker. This is terrible news.

Let me explain why I am so reluctant to have any communication with you.

Similar to you, I also have an intense response to stress, and that mainly consists of eliminating
the original source. In this case, it was you. After seeing how upset you were intially, I realized
that you have a complicated history and I didn't want to be involved. And the more upset you got,
the more I wanted to distance myself. It may have been a selfish way to handle things, but I
believe it was the best thing for me.

You sent me over 50 messages and nonstop called me for several hours. You feel you have a
justified explanation for this. But in my mind, there is no justification for such behavior. It scared
and upset me. I told my friends because I needed their support.

But now I understand you were out of sorts. And we can put that whole thing behind us.  I want
you to understand that I don't feel any animosity towards you. You are an interesting person with
lots of quirks, and you are going through a tough spot. I just feel that distance would be a good
way to let things simmer and move on asap until January. We are not friends right now, but we
can be in the future.

Right now, my focus is to study, study, study for Core 2 exams. And anything that interferes
with that is going to be a problem. I honestly can't afford to put any more time into this matter.
Please understand that like you, being at keck means the world to me, and I want to do my best -
and this means studying non-stop with no interruptions until exams end.
Good luck.
Best,
Amy

D-12

USC 0033

**EXHIBIT**

From Amy Baughman <abaughma@usc.edu>
Sent Friday, December 16, 2005 5:24 pm
  To "jdi@Alum.Dartmouth.ORG" <jdi@Alum.Dartmouth.ORG>
Subject status

Jeff,

I told you before Thanksgiving break that I wanted no contact from you.  I told you first in person outside the library, in a text message later that afternoon, and then through Dr K, and that again, at our meeting with Dr. K.  You refused to such an arrangment.  In response to teh email you sent the following week, I replied that I needed to focus on studying.  So you did not contact me.  In the past week you have approached me several times to small talk.  And today, as you pointed out, exams are finished.

However, based on our interactions up to date, I do not feel we can or should be friends.  You have made me uncomforble on several occasions (barrage of phone calls on texts, then refusing to stop contacting me, and then continuing to try small talking with after I've repeated told you I want nothing to do with you, which culminated in today's counter productive conversation.  Today confirmed that communication between us on any level is a bad idea.

Perhaps I have been unclear. i will spell it out here. I do not want to receive any more email, phone or text contact from you.  I do not want any further "explanations" from you.  Things unraveled in an unpleasant way and nobody is at fault.   I realize that you may have a strong reaction to this letter, and I suggest you direct your feelings towards another party. I want NOTHING else to do with this situation and from this point on will do everything in my power to make it so.  I am putting this whole business behind me and I hope you can too.

I believe that we can coexist in medical school.  There are close to 200 students in our class and there is absolutely no need for us to be on good, friendly, or any terms at all.  We both worked hard to get here and deserve to try our best in making it work. For me to do this, I need you to leave me alone.

Amy

E -13

USC 0179

**EXHIBIT**

From Jeffrey.D.Isaacs.99@Alum.Dartmouth.ORG (Jeffrey D. Isaacs 99)

Sent Saturday, December 24, 2005 4:13 am
To abaughma@usc.edu
Subject status post

Dear Amy,

I'm writing about what happened between us last semester. This email is meant to be reconciliatory, but I must apologize in advance because this effort requires some transparency.

You asked me not to contact you ever again on Friday; you did this about a month ago as well. In contrast, over the past two weeks you sent me some letters that seem civil and caring. You also spoke with me on two occasions: first in anatomy review, and second, immediately following exams. I thought our discussion in anatomy review was actually quite warm given the circumstances. Afterwards I noticed you come into the library, look at me and cough, and proceed to leave the room. Both of our discussions were almost exclusively about exams and, moreover, the death of my best friend's father. Your reference to this as small talk was somewhat insulting to me and, indirectly, my friends. But I understand that a lot of tension built up, and by Friday, your email to me carried with it deep frustration. Nevertheless, I am disappointed and wonder what happened. I can't think of anything I did to explain this. I can only guess at what may have influenced your change. Earlier in the week, a friend of yours enquired in a probing way about my relationship with my best friend. I made a difficult decision not to go to the memorial service. In retrospect it was the right decision, only because I passed Core so narrowly that going to NY would have been precarious at best. Should you have questions about this situation, George will be in San Diego in early January staying on his yacht, and you are more than welcome to query him directly. All I know is that last Friday, I was informed that you asked people to keep me away from you. I was surprised, and sought elaboration from you
. We had a counterproductive discussion in some kind of laboratory - there are better things we could have been doing after exams.

You dismissed the value of "explanations" in your previous letter, and generally I am of the same philosophy. I was hoping to talk about things in a laid-back environment to establish trust. This email will have to suffice. I want to provide a few additional details, given that I've already written you partial explanations. First, I mentioned PTSD as a reason why I didn't start medical school until now. It's a contributing factor but perhaps an oversimplification. Even a basic google search on me would reveal an early interest in health care technology development. My father, who got his doctorate at Penn, arranged for me to be mentored by a few individuals that made world-class contributions to global health care. I have aspired to achieve like some of these friends from a young age, and hence made some uncommon decisions accordingly. I think I mentioned to you once that as a child and teenager, I spent alot of summers in the Vineyard with one of my close mentors/family friends. Anyway, long story short, graduating college in the peak of the tech boom, I thought venture capital was the best way to contribute to this field. Moved to Paris to work - still miss driving my Vespa around carefree, and the parties, with all the music that you make fun of. This turned into a position in NYC, and gave me continued independence from everything in making decisions. I started thinking about what to do for the rest of my life and entered a one-year international studies program in Asia to reflect. Racking up degrees was not my plan nor anything I endorse, per se. It was supposed to be a one-year MBA, but I spread it out over two years to vacation throughout Asia and Oceania. Much of these years including and following Dartmouth consisted of extravagance and elitism that I came to question; it was also once-in-a-lifetime experience that I don't shun by any means. I reconsidered alot of Western ideals and their importance, and decided international med was where I should focus in the near term. I spent four months sailing the barrier reef with a med student from New Zealand, who tutored me for the MCAT on our boat. I considered attending the same British med school as she, and my acceptance there has been held open for two years. Ultimately I held out to see what US options I had. What this meant, though, was that I had to defer a perfectly good med school position and keep my fingers crossed for USC.. It sucked, I went to law school for a semester, put on twenty pounds, and then went to Sri Lanka. Worst year of my life(except Sri Lanka). I know this caused me to get off to a late start in becoming engaged with everything at Keck. USC was by far my top choice among American med schools; I applied early and think the clinical work is amazing. I even miss LA a bit.

So given that brief, unfairly brief, synopsis, I want to say that I am thankful to you for, perhaps without your knowledge, helping me through some issues. My mood and spirits lifted after Core I and you were around me during this period. I lost fifteen pounds during Core II and feel much happier. I think this has been a source of confusion; we had significant problems, and meanwhile, I'm feeling more engaged and able to live present-day. Basically I think sometime around the Mexico trip I was able to start putting the prior year behind me, which as I said, was the worst year of my life by far. So yeah, summing it up, you holding my hand for a few minutes to go swimming at 2AM in Mexico had much greater ramifications than you probably imagined. That was supposed to be a joke - at the same time, it's serious enough that I wrote this letter. I don't expect anything from you. Like I said last week, however, it would mean alot to me if we are able to be friends - in whatever capacity you may prefer.

I feel this email is a reasonable effort to get to the bottom of all this and figure out the best way to put it behind us. To this extent, the ball is very much in your court. I realize sometimes you get second chances, and sometimes you don't. I'm amenable to whatever you want at this point, you don't owe me anything. I do think we are two rational med students who can manage this on our own. You said it to me earlier in the year, you are very good at influencing dynamics, so I have faith you could make this situation as you'd like.

I am sending this letter very close to Christmas; I don't know what that means to you - actually I'm still perplexed why, in Las

F-14

USC 0180

Vegas, you approached me and emphatically remarked "You aren't Christian, are you?" . So for what that's all worth, have a great xmas.

Best regards,
Jeff

F-15

From Jeffrey.D.Isaacs.99@Alum.Dartmouth.ORG (Jeffrey D. Isaacs 99)

Sent Wednesday, December 28, 2005 4:13 am
To abaughma@usc.edu
Subject Greetings from a dilapidated train

Dear Amy,

Should have gotten the aircon train. Actually I'd rather have no laptop and no aircon..

Please understand I'm not writing you to be defiant. I am trying to mitigate a situation that, as you said, unraveled in an unpleasant way. I personally do not believe I did anything to warrant you feeling so uncomfortable. Yes, I regret doing a few things that were really pretty unkind, and the more sleep I get, the more I am embarrassed about these errors.

I like you and am curious about you as a person, and I'm pretty sure you know this much. I am of the firm belief that unjust peer pressure at Keck exacerbated our tension. I think you would agree there is pervasive commentary about our interaction. For example, and relatively benign in context, I remember hearing people joke with you about getting into the shower with me in Mexico. You say that I worry about what others think, but I have to say I think it's you who does. Most people I know have very strong 'backbones' and I expect this out of my friends. I try to enjoy a separate social life from med school, and only seek to maintain a good working relationship with most people in our class. In a little over a year the classroom atmosphere will go away, and I'm more interested in sustained friendship in terms of doing overseas work, vacationing with friends, etc etc. Other than the fluke semester at law school, most recently I've been around older people at a later stage of life. Anyway, given all this I am in agreement that we shouldn't talk at school because it seems to make things more difficult. A civil and respectable conversation with me outside of school is more my style, and I'd really enjoy the opportunity to get to know one another better one of these days. I don't mention you to anyone at school anymore, so if it's "pride" getting in the way of us reaching a truce or even friendship, please try to see beyond that.

I am willing to go out of my way to make you comfortable and prevent any professional problems for either of us. If, indeed, your stance is to be totally left alone as per your email dated Dec 16th, I will be compliant in resolving such a request. Both of us had tears in our eyes this day, and I personally think we were exhausted more than anything else. Regardless, I hereby offer to cover all legal fees to draft whatever agreement you reasonably need - from changing study spaces, parking lots, etc if you so desire. I think it's unnecessary, but at your request, I shall honor this offer which is probably more favourable to you than most other remedies available for this situation.


Sincerely,
Jeffrey D. Isaacs

F-16

USC 0182

From Jeffrey.D.Isaacs.99@Alum.Dartmouth.ORG (Jeffrey D. Isaacs 99)

Sent Friday, December 30, 2005 6:17 pm

To abaughma@usc.edu

Subject

Dear Amy,

Tonight is New Years Eve and I head back to LA tomorrow. Quite honestly, it really hurts that you didn't respond at all over
break. I genuinely thought you might rethink what you said and wrote to me on the 16th. There is little I would not do to be on
better terms with you. I mean that. I have my ideas for how this could happen, but I think it's best to leave a blank slate open
for you to consider.

-Jeff

F-17

USC 0183

**EXHIBIT G**

From Jeffrey.D.Isaacs.99@Alum.Dartmouth.ORG (Jeffrey D. Isaacs 99)

Sent Thursday, January 5, 2006 8:41 pm
To abaughma@usc.edu
Subject sorry, Amy

Hey Amy,

Hope you're enjoying being back in LA.

I want to say how sorry I am for how I treated you last semester. This should have come earlier but there was just way too much emotion, bronchitis, and jet travel involved. I'd like to forgive and forget the whole thing ever happened.

It's asking a huge favor, but I feel like there is a middle ground that we could go back to that would help me alot. For me, sitting in any room with someone who said they want nothing to do with me is continually painful and not something I want to be the case during the rest of medical school. I don't know if you can understand what that is like, and being a rather sensitive person, it really is tough for me.

George was asking me about what happened. He suggested, and I think it would actually be very nice, that we meet during his trip to SoCal next week. He's staying with me in Santa Monica next monday/tuesday before heading down to stay in San Diego for a week -his father had just built a yacht to circle the world in, and George is deciding what to do with it. I'm pretty sure you and I have friends/acquaintances in common and I do feel terribly about what happened regardless. I hope you consider this as simply a gesture of goodwill, and a significant one for me.

I'm planning on moving forward this semester. To kick start this process, I know it would be easier if we could be on friendly terms (as you define them). If there's any chance you could share your response when you have time, or preferably discuss with me, it would be helpful.

I know some of my letters have not been the most direct. I admire and usually consider myself a straight-shooter and I hope you sense from this letter that I am being completely honest and fair with you.

Regards,
Jeff

G-18

**USC 0184**

**EXHIBIT**

USC Web Mail - Please View Frame 1

From Jeffrey.D.Isaacs.99@Alum.Dartmouth.ORG (Jeffrey D. Isaacs 99)

Sent Friday, January 6, 2006 3:51 pm
To ab002i@yahoo.com , abaughma@usc.edu
Subject Forwarding of email.

Dear Ms. Baughman:

That was not right of you to forward my email containing George's invite to another guy in our class. That was private. You told me you kept my emails to yourself.

Signed,
Jeffrey Isaacs

H-19

**USC 0185**

From Jeffrey.D.Isaacs.99@Alum.Dartmouth.ORG (Jeffrey D. Isaacs 99)                                 ▶
   Sent Saturday, January 7, 2006 4:39 am
     To ab002i@yahoo.com , abaughma@usc.edu
Subject Yo Amy

Do you want me to drop out of med? If so, just tell me and I will.There are other things I could be doing than putting up with
this crap. I think it's a pretty steep price to pay for being attracted to you, even though I do feel sorry for how I handled the
situation. I know you get the gist, but you never gave me a decent chance - but hey, that's your call. All I know is that there is
nothing in my past that couldn't be made distant history by a somewhat normal med school experience. and although it was
very real, much of it was not. You could help me instead of making it worse, but again, do whatever you want.. I'm beyond
threatening lawsuits or any ridiculousness like that- i only fight battles worth fighting. To spell it out -- I DONT HOLD
ANYTHING AGAINST YOU BUT ID LIKE THE STUPIDITY TO END. we're just two people that shit, eat, breathe, (and go to
Keck SOM)... oh yeah and we're both children of half german half english Pennsylvania boys.. so whatever.

You can disregard my previous email. I won't mention things to you without the expectation that the whole class will probably
hear. i'd like things to be between you and I but that's not my decision. And I won't call you - your friend said something
tonight about changing your number because of me..please don't inconvenience yourself. If I have something to say I'll say it
this way if you still let me. I was actually having a pretty fun time tonight and not thinking about all this until people started
coming up to me and asking questions. FYI I am sober, I had two beers around 11PM.

Wanted to ask you about the imsig thing since I'll be in San Diego anyway. not a big deal, oh well.

peace.

H-20

**USC 0186**

From Jeffrey.D.Isaacs.99@Alum.Dartmouth.ORG (Jeffrey D. Isaacs 99)                              ▶

Sent Saturday, January 7, 2006 2:47 pm
To abaughma@usc.edu
Subject Yo again (2) email prob

Slept well despite a few nightmares about you. I am seriously considering dropping out, waiting for exam results but the bigger issue is you. I can't be around you for four years like this. I'm not one to beg, Amy, but in this case, I am pleading with you to have a discussin with me or me and a friend.

this is where the suit was from last night... you don't even get my good stories like this, just bring out my worst.

Camilla's son was 'drugs supplier'
From the archive, first published Monday 24th May 1999.

Camilla Parker Bowles's son supplied pals with drugs while he studied at Oxford University, claim his ex-college friends.

Prince Charles's godson Tom Parker Bowles, 24, bought cocaine, ecstasy and cannabis for himself and friends during his three years at Worcester College.

One source told a Sunday paper: "I would put an order in and Tom would come back with what I wanted."

During his first year, he was arrested for possession of ecstasy tablets and cannabis after being searched leaving a south London nightclub. He claimed the drugs were for personal use and escaped with a caution.

Mr Parker Bowles confessed to taking cocaine last week and has since promised his mother and Prince Charles he will stay clean.

Another friend said: "Tom was well known as a heavy drug user and somebody who could get you drugs if you wanted them. He was quite open about taking drugs and when he went to buy them from dealers, he would often get them for his friends too.

"He seemed to be able to get pretty much anything I needed - cocaine, cannabis, Ecstasy. He certainly liked to party and drugs and alcohol were a very important part of his life. They were an important part of a lot of people's lives at Oxford and from what I understand, they still are." Parker Bowles became a 'baron' of the secretive society, Assassins, known for its bizarre parties and drinking sessions.

He was a founder member of the Oxford 'brat-pack' which included Lord Frederick Windsor, son of Prince and Princess Michael of Kent, Piers Adam, founder of fashionable K-Bar chain, and Peregrine Hood, son of 4th Viscount Bridport, who is now described as 'out of control'.

Prince Charles is said to be 'fraught with worry' that William is now seen out with the group and has asked his son directly if he has ever taken drugs.

The Marquess of Blanford, heir to Blenheim Palace at Woodstock, admitted being addicted to cocaine for five years, and said: "I know to my own personal cost that drugs ruin your health, disturb your mind, cost all your money and hurt family and friends. "Tom might not know it yet. He might be so deeply in danger that he thinks all this is funny, but he is now a moving target. I hope this is the shock he needs to turn his life around."

H-21

**USC 0189**

From Facebook <confirm@facebook.com>

Sent Saturday, January 7, 2006 7:20 pm
To abaughma@usc.edu
Subject jeffrey isaacs has listed you as a friend...

Jeffrey Isaacs has requested to add you as a friend, but before we can
do that, you must confirm that you are in fact friends with Jeffrey.

To confirm this request, go to:
http://usc.facebook.com/confirminvite.php

Thanks,
The Facebook Team.

+ message on Facebook (deleted)

H - 22

**USC 00190**

From Jeffrey.D.Isaacs.99@Alum.Dartmouth.ORG (Jeffrey D. Isaacs 99)                    ▶

Sent Saturday, January 7, 2006 8:12 pm
To ab002i@yahoo.com, abaughma@usc.edu
Subject Request for counseling

Hey Amy,

I have been thinking alot today. And not eating - I have barely been able to eat for a while.

First, I want to address why I wrote you four emails today.

I was planning to minimize contact with you assuming you did the same. This did not happen. Yesterday at MedProm I
understand you requested that friend(s) to speak with me. When I entered the Pre-Prom party, you left the room for the
remainder of the party and I felt bad. I want to tell you that I intentionally showed up at 9:30 just to share taxis, as I did not
want there to be any uncomfort if you were there (which I didn't know but thought was likely). Unfortunately there was a
problem with the taxis and I ended up being there for almost an hour before they arrived.

At the MedProm itself, you made physical contact with me twice. Noone else that entire evening, except Krishna who tends to
now tap/push me when he sees me, made contact with me. Many people had more to drink than you (judging by the color of
your cheeks), so I cannot accept that this was accidental both times. The first incident I walked over to join part of my ICM
group in line for the bar. Apparently you told them you were "going to leave", so presumably you saw me walking towards the
group in line. You then walked towards my direction and firmly tapped my hip. On the second occassion, I was on the dance
floor about eight feet from you, when you backed into me abruptly, pretended to be surprised to have bumped into me, then
quickly went to the other side of the dance floor.

The reason I tell you this is so you know EXACTLY what I am thinking/perceiving.

I am concerned about this situation, perhaps more so than ever. A month ago Dr. K mentioned to me the possibility of
counseling through student health that could involve both of us. I was wondering if you would be receptive to this. As you
know, I am seriously considering my place at Keck and attribute this primarily to what transpired with us. If this counseling
sounds like a possibility you can let me know or bring it up with Dr K or someone. I hope you consider it, since you haven't
responded to my request that you join up with George to talk about this. He's one of the most reputable people I have ever
met and I think this is a good opportunity to calm things down. I'll be spending much of the week with him, so I think an hour
with you too would be a good change of mindset, actually.

I don't know your philosophical beliefs but if you could forgive on some level and try to help patch some problems that relate
to you, I think in the long run you'd be happy you made that choice.

Jeff

H-23

USC 0191

**EXHIBIT**

From Jeffrey.D.Isaacs.99@Alum.Dartmouth.ORG (Jeffrey D. Isaacs 99)
Sent Sunday, January 8, 2006 1:21 pm
To abaughma@usc.edu
Subject Beach

Amy,

Going for a run on the beach. Made me think, all I am still asking for is a chance to talk to you in private, with no pressure from anyone else, no recorded emails, etc etc. Maybe we could go for a walk on the beach or something. Everytime we have spoken since mexico you have put me on the defensive, which I think is why there is this skewed perspective now. There's just stuff I haven't been able to say over email and in fact, what I have said is mostly negative stuff about me, I've realized. I guess this is asking a lot, from your perspective, but to me it's pretty reasonable and important.

I read your facebook profile. Didn't know you sailed...i didn't think you were the adventurous type given your comments about flying. we can go sailing too if you'd like. one thing i wanted to talk about in person was the whole friends/date thing, and I think i've said things which give you the wrong impression of how I think of things in this regard. But I don't think , at this point, anything I say over email or in a pressured conversation will mean much to you, and that is why I want to talk somewhere, admittedly, on my terms for an hour.

Have a nice day.

Jeff

I-24

USC 0193

From Amy Baughman <abaughma@usc.edu>

Sent Sunday, January 8, 2006 8:58 pm
    To Peter J Katsufrakis <pkatsu@usc.edu>
Subject jeff isaacs and restraining order

Dr. K,

I'd like to talk to you tomorrow (monday) if you have a moment. I am planning on filing for a restraining order through the
school tomorrow. I was going to call the Center for Women and Men and see what they suggest, but the general consensus
from my friends and family is that my current strategy is not working. Jeff followed me around at Med Prom and has sent me
numerous emails over the weekend and also over break. I haven't responded to anything, having sent a clear email before
break stating that I wanted zero contact from him. I have a new cell phone number but I am having trouble blocking him
from my email. But the bottom line is that I feel like he's stalking me and he's hit a 10 on my creepometer. Please let me
know if you have a moment. My new cell is 617 913 5209. Thanks.

Amy Baughman

I·25

**USC 0233**



From Jeffrey.D.Isaacs.99@Alum.Dartmouth.ORG (Jeffrey D. Isaacs 99)                    ▶

Sent Monday, January 9, 2006 12:03 pm
To abaughma@usc.edu
Subject
Are you going to reply to me or just forward my emails to others?

J-26

From Jeffrey.D.Isaacs.99@Alum.Dartmouth.ORG (Jeffrey D. Isaacs 99)                    ►
Sent Monday, January 9, 2006 1:59 pm
  To abaughma@usc.edu
Subject Lawsuit

Dear Ms. Baughman,

I did not attend class today as I was preparing a lawsuit against you. I realize I have wavered on this issue, partially because I was keeping my fingers crossed for a resolution, and partially because you have made me unstable in this regard.

My friend is visiting LA beginning tomorrow for one week. If I do not hear from you during this period, I will forward the relevant court service process to you and your father at his NIH mailing address. I can tell you my choice is to review the facts of the case with the appropriate parties in order to reach a timely settlement, in lieu of filing.

Any follow up to this letter must be addressed to this email address.

Regards,
Jeffrey D. Isaacs

J-27

USC 0195

**EXHIBIT**

Baughman, Robert (NIH/NINDS) [E], 09:51 PM 1/10/2006 -0500, FW: Lawsuit

Date: Tue, 10 Jan 2006 21:51:57 -0500
From: "Baughman, Robert (NIH/NINDS) [E]" <baughmar@ninds.nih.gov>
Subject: FW: Lawsuit
To: pkatsu@usc.edu
Thread-topic: Lawsuit
Thread-index: AcYWN/ebt9TuTLWeSlii+y0Q/mGJ/wAlbG8A
X-MS-Has-Attach:
X-MS-TNEF-Correlator:
Original-recipient: rfc822;pkatsu@usc.edu
X-OriginalArrivalTime: 11 Jan 2006 02:51:58.0240 (UTC)
FILETIME=[FD313A00:01C61659]

I received this today and am even more concerned for Amy. Tomorrow I will go to USC to see Amy and consider how to proceed.

-----Original Message-----
From: usc2006 usc2006 [mailto:a2006usc@hotmail.com]
Sent: Tuesday, January 10, 2006 5:48 PM
To: abaughma@usc.edu
Cc: Baughman, Robert (NIH/NINDS) [E]
Subject: Lawsuit

Dear Ms. Baughman,
I did not attend class today as I was preparing a lawsuit against you. I realize I have wavered on this issue, partially because I was keeping my fingers crossed for a resolution, and partially because you have made me unstable in this regard.
My friend is visiting LA beginning tomorrow for one week. If I do not hear from you during this period, I will forward the relevant court service process to you and your father at his NIH mailing address. I can tell you my choice is to review the facts of the case with the appropriate parties in order to reach a timely settlement, in lieu of filing.
Any follow up to this letter shall be addressed to jdi@alum.dartmouth.org
Regards,
Jeffrey D. Isaacs

---

Express yourself instantly with MSN Messenger! Download today – it's FREE!
http://messenger.msn.click-url.com/go/onm00200471ave/direct/01/

K-28

USC 0262

**EXHIBIT I**

**USC**

UNIVERSITY
OF SOUTHERN
CALIFORNIA

**Student Affairs**

January 10, 2006

Jeffrey Isaacs
425 Broadway #408
Santa Monica, CA 90401

Dear Mr. Isaacs:

Amy Baughman has asked that, pending a possible Student Judicial Affairs review, I require you and her each to avoid contact with the other until such time as this order is lifted in writing by Student Judicial Affairs. The Vice President for Student Affairs has delegated to me the authority to make this order based on the right of every USC student to avoid contact with another student if he or she determines that such contact may be harmful or detrimental. This order does not imply any judgment regarding the factual nature of Ms. Baughman's complaint.

With this information in mind, I ask both you and Ms. Baughman's to refrain from:

i) approaching one another at any time;
ii) calling one another at any time;
iii) sending via campus or regular mail or e-mail or text message, anything to one another;
iv) contacting or communicating with one another – including through a third party – in any way at any time.

This letter will remain in a file in my office and will be made available to the appropriate university personnel if a grievance or Student Judicial Affairs complaint is filed by either party against the other party regarding further difficulties and/or breach of this order. If you have questions about this matter, please be in touch with Raquel Torres-Retana at Student Judicial Affairs, or with the representative of Student Affairs whom Ms. Torres-Retana will assign to assist you in understanding the processes involved.

Sincerely,

Lynette S. Merriman
Associate Dean

University of
Southern California
Student Union 201
Los Angeles,
California 90089-4891
Tel: 213 740 2421
Fax: 213 740 5229

cc.    Amy Baughman
       Raquel Torres-Retana, Director, Office for Student Judicial Affairs
       Department of Public Safety

L-29

**USC 0201**

**EXHIBIT M**

Amy Baughman, 07:32 PM 2/17/2006 -0800, Fwd: returned mail

(ORCPT abaughma@usc.edu); Fri, 17 Feb 2006 18:45:27 -0800 (PST)
Received: from emsvr.com (localhost [127.0.0.1])
    by emsvr.com (8.12.11/8.12.10/CWT/DCE) with ESMTP id k1I2jNSp010945      for
<abaughma@usc.edu>; Sat, 18 Feb 2006 02:45:23 +0000 (GMT)
Received: (from mail@localhost) by emsvr.com (8.12.11/8.12.11/Submit)
  id k1I2jNWH010941     for abaughma@usc.edu; Sat, 18 Feb 2006 02:45:23 +0000 (GMT)
Received: from [205.188.157.36] by emsvr.com [208.185.243.103]     for
<abaughma@usc.edu>  on-behalf-of Jetyssey@aol.com; Sat Feb 18 02:45:21 2006
Received: from imo-d04.mx.aol.com (imo-d04.mx.aol.com [205.188.157.36])
    by emsvr.com (8.12.11/8.12.10/CWT/DCE) with ESMTP id k1I2jKaB010930      for
<abaughma@usc.edu>; Sat, 18 Feb 2006 02:45:21 +0000 (GMT)
Received: from Jetyssey@aol.com     by imo-d04.mx.aol.com (mail_out_v38_r7.3.)
 id s.1e.54e0251c (17377)     for <abaughma@usc.edu>; Fri,
17 Feb 2006 21:45:12 -0500 (EST)
Content-return: allowed
Resent-date: Sat, 18 Feb 2006 02:45:23 +0000 (GMT)
Date: Fri, 17 Feb 2006 21:45:12 -0500 (EST)
Resent-from: Jetyssey@aol.com.mbrxjvcgqbpdsxk.emsvr.com
From: "Jetyssey@aol.com" <Jetyssey@aol.com>
Subject: returned mail
To: abaughma@usc.edu
Errors-to: Jetyssey@aol.com.mbrxjvcgqbpdsxk.emsvr.com
Reply-to: Jetyssey@aol.com
Resent-message-id: <200602180245.k1I2jNWH010941@emsvr.com>
Message-id: <1e.54e0251c.3127e438@aol.com>
MIME-version: 1.0
Content-type: text/html; charset=US-ASCII
Content-disposition: inline
Notice-Requested-Upon-Delivery-To: Jetyssey@aol.com.mbrxjvcgqbpdsxk.emsvr.com
X-Mailer: 9.0 for Windows sub 5043
X-Spam-Flag: NO
Original-recipient: rfc822;abaughma@usc.edu

this came back returned from earlier from my dartmouth account.

subj:text message

not sure if your phone received a text I just sent you. I failed my exam today and it will be difficult
to even face my family or my friends who I was supposed to hang out with this week in San
Diego. People have done so much for me and everyone thought I had finally hit it right – med
school in CA would be perfect for me. I feel like i've given up so much that I will risk telling you
what I have been holding back.

I got to USC and part of me still wanted to be in med school in another country with my ex-
girlfriend. Because of this, I couldn't be my normal self and was reluctant to make friends since I
wanted to leave. I knew what I was normally like, but none of you did. You changed this for me. I
started to see the possibility of feeling like my self again. I thought you were on the same
wavelength with your email understanding that I was 'feeling out of sorts,' but I wasn't sure. I am

M-30

Amy Baughman, 07:32 PM 2/17/2006 -0800, Fwd: returned mail

sorry for what I am about to say, I didn't even realize what was going on at the time, but I honestly believe that I fell in love with you. Call it foolish, clearly unrequited, but it happened. I have thoroughly embarrassed myself because I was unable to deal with emotions stemming from these feelings and how they related to the worst episode in my life - a girl whose father wouldn't let her marry me because of my religious background.   what my ex-girlfriend's father did to me caused me to overreact and jump to conclusions, hence the email to your father, just because of his relationship with Dean Henderson. But this was my issue, and you didn't deserve any of this in your first semester of medical school.

I accept full responsibility for my inappropriate actions and will do so in the SPC hearing.  I want to move on and realize my potential. The 61 I got on heme is just the way things worked for me , because I had to get over some things to focus on med. I think i'll be able to now, and hopefully time will prove me right.  I just want you to know that I feel guilty beyond words for causing you any pain. The biggest loss for me here is not the 61, the public embarrassment, but rather, feeling guilty that I unintentionally put you through my own sorting out of issues.

I am sorry.

Jeff

M-31                                    USC 0032

Case 2:06-cv-03338-GAF-E    Document 68    Filed 03/31/08    Page 46 of 62    Page ID
#:380
Amy Baughman, 07:22 PM 2/25/2006 -0800, Fwd: I think this is everything..off to San Diego

Date: Sat, 25 Feb 2006 19:22:06 -0800
From: Amy Baughman <abaughma@usc.edu>
Subject: Fwd: I think this is everything..off to San Diego
To: budartur@usc.edu, erinquin@usc.edu, pkatsu@usc.edu
X-Mailer: Sun Java(tm) System Messenger Express 6.2-5.02 (built Dec  1 2005)
X-Accept-Language: en
Priority: normal

Date: Sun, 19 Feb 2006 20:11:52 -0500 (EST)
Resent-from: Jetyssey@aol.com.ekponjqggfkptzi.emsvr.com
From: "Jetyssey@aol.com" <Jetyssey@aol.com>
Subject: I think this is everything..off to San Diego
To: abaughma@usc.edu
Cc: jdi@alum.dartmouth.org

-Yesterday a friend called me from NYC. He was in my fraternity at Dartmouth. He's Chinese,
incidentally. Wanted to see how things are going, he hadn't heard and was completely shocked.
Had been camping with him this summer and we were talking about how perfect everything was
looking for both of us - he's a successful financier. Anyway, he reminded me of a time at
Dartmouth where I (drunkenly) kicked down his door in our fraternity and he didn't talk to me for a
week. I tell you this because I think you are like me in that regard and have done some silly
things, but who hasn't. But I think, call me crazy, you are sometimes self-destructive (like me)
because of some conflict on the whole hybrid vigor thing. That's really what I wanted to get
across if we ever could have had group counselling, which I know, seemed silly considering our
relationship consisted of a lousy back massage.. Back to my fraternity friend, point is, anyone
who knows me could tell you a few (or a bunch of) funny stories, but they'd only tell them in the
context of harmless quirks - because I am someone who, until now, had everything going for me
despite some adversity(and other times, privilege) in my life. Well he told me he could help me
get a job in his investment bank if I got kicked out - I replied I didn't want to give up on medicine
just yet.

-Back before Core I exams, you were just randomly sitting next to me in a lecture, talking about
your respect for PhDs and suggested we study at some point for exams. I remember thinking,
Amy seems really awesome, but I don't want to form study partners because I may not return
next semester. I probably said nothing in response and to you I mush have just seemed shy. At
that point, I still had an acceptance to another foreign med school, and as I told you, was really
questioning if I'd stay at USC.

-On that note, I know right now I'm perceived as totally inept at dealing with women/relationships.
To my credit I have had 4 relationships over the last 10 years each lasting about 2 years each.
Please don't take this the wrong way, but each girl was rather WASPy, confident, well poised,
etc, and similar in many ways to you. Except for the one from New Zealand, they ended
amicably. So falling for you was a little unexpected for me. That's the only word I'll use -
unexpected - because I have many friends around the world from all different backrounds,
married to people of different backgrounds, etc.. I was , during the library /phone incident on nov
18th, about to send you a text message that said "You had me at Konichiwa" but I didn't,
because I thought it would be perceived as racist even though I meant it to be cute.  The fact is
my family has all kinds of japanese stuff all over their respective houses, etc, because this is my

Printed for Peter J Katsufrakis <pkatsu@usc.edu>                                                    1

M-32                                                            USC 0035

**Amy Baughman, 07:22 PM 2/25/2006 -0800, Fwd: I think this is everything..off to San Diego**

sister's work and the family really loved all their time in Japan. And for me, coming from diverse backgrounds, the most hypocritical thing in the world I could do would be to make fun of you for that. And I thought we could trust each other after our chat. As far as the texts, I do think that was the moment when I got over my ex-girlfriend and realized my feelings for you. You had no idea, and I just looked like a total jerk, and whoever picked up the phone and called me an asshole was totally justified. I would have done the same thing.

-Right or wrong, I think of myself a bit like the character in Good Will Hunting, from math ability right down to court hearings (that won't happen) representing myself, citing court opinions from 1812. I bounced around quite a bit in my life, and the only thing that keeps me going is potential, determination, and people who have faith in me helping me out once in a while. I know I need to end up with a strong girl, and that you are. I didn't bounce around between abusive foster homes, but rather, caring families, so maybe the comparison is an exaggeration. From 6th grade (parents' divorce) until college, I spent most of my time with my high school best friend's family. Every weekend. Every break. They live about 40 miles outside of Philadelphia. They are a devout Christian, German family, in an area that isn't quite PA Dutch but almost. The father is a small town vascularthoracic surgeon, and one of my early inspirations to become a doctor. I also spent summers with a family in Martha's Vineyard. They were friends of my fathers. CEO at the time of the largest pharma company in the world. Always telling amazing stories about health care and made me start to think about administrative backgrounds in addition/in lieu of medical school.

-as for College, you know about George. He's like a brother to me. I know how mentioning him to you, in the context I did, may have been wrong, and god I am sorry for that. I was devastated and just did what was spontaneous. Threatening lawsuits to you at the time was just not right--it was like, give me sympathy or I'll sue you. It was totally wrong but I was in shock. Totally wrong except I did think you had some of your own difficulties at Keck and I was trying to get everyone to think twice about what was happening. Amy you know I am a bit traditional.. I don't think of it as conservative because I'm pretty damn open minded, but my friends are my friends because we share similar views on life, not because of money, race, religion, or anything else. You'd get along really well with my friends and I know it. That said, George is having friends on his boat next weekend.the captain of the yacht is a naval officer so it's safe to say it would just be drunken good fun and nothing more than that. I won't tell anyone if you want, it would have never happened, so to speak. I do want to throw out one idea for you to ponder.

I guess you wonder why I'm telling you more of my life story. It means alot to me; to you it may be Bla Bla Bla, I really hope not. My ICM instructor (who in addition to being a top surgeon, is a gifted musician and ex-hippy I think you'd connect with) was concerned about me, and I opened up with him about much of what I've shared with you over the last few days. I know I've told you about my feelings, and that's probably tough for you to hear. I have gotten over being in love before, I'll do it again if I have to but it's pretty damn hard when you see the person in 8 hours of class a day though. I'm going to try my hardest in neuro to focus. I did have a concussion/MTBI in college and this was the 'trauma' I had referred to months ago, so neurology really is an area that I want to learn about.

As for this, it was all worth it, because life is about those you care about, a career is nothing by itself. The happiest people I've seen in three different grad schools(not to mention, life) are those that have found stable personal lives and could sustain focus and really rely on someone else,

M-33

USC 0036

not just a group of friends, most of whom are transient. I feel like we each took out hardships on each other, in my opinion, because we did trust each other on some level. Speaking for myself, it is time to back off and fess up. I am doing that at the SPC hearing. But you are the ultimate judge. I've done enough now that you can get me expelled if you think I wronged you that badly. I did it because of the strongest feelings for you. I know you can figure out a way to give me a chance if you want to. I promise I won't let you down again. Whatever happens, I want us to both be at graduation in 2009, on our way to great things.

Take care.
Jeff

PS- you called me strange a few times and I took that as a compliment.

THERE WAS A BOY
A VERY STRANGE, ENCHANTED BOY

THEY SAY HE WANDERED VERY FAR

VERY FAR
OVER LAND AND SEA
A LITTLE SHY
AND SAD OF EYE
BUT VERY WISE WAS HE

AND THEN ONE DAY

A MAGIC DAY, HE PASSED MY WAY

AND WHILE WE SPOKE OF MANY THINGS
FOOLS AND KINGS

THIS HE SAID TO ME:
THE GREATEST THING
YOUâ€™LL EVER LEARN
IS JUST TO LOVE
AND BE LOVED
IN RETURN

(The Moulin Rouge)

M-34

**EXHIBIT N**

**USC**
UNIVERSITY
OF SOUTHERN
CALIFORNIA

March 1, 2006

**Keck School of Medicine**
University of Southern California

**Office of
Student Affairs**

Mr. Jeff Isaacs
425 Broadway #408
Santa Monica, CA 90401

Dear Mr. Isaacs:

As you know, the Year I/II Student Performance Committee reviewed your academic record at their meeting on Monday, February 27th. You had been invited to speak to the Committee in person, and appeared before the Committee to do so and to answer questions. This letter will document the proceedings of the Committee in your regard, as well as our conversation the following day.

The Committee was aware of your interactions with a classmate, Amy Baughman, including the stay away order sent to you by Lynette Merriman on January 10, 2006, which remains in effect. The Committee was aware that subsequent to that order, you made contact with Amy Baughman, in direct violation of that order.

After due deliberation, the Committee decided, specifically, that:

• You are to be suspended immediately until further notice, and are to stop attending classes.

• You are to continue to stay away from Amy Baughman, as previously directed.

• You are to undergo a psychiatric evaluation within thirty days, details to be arranged by this office.

• You will be considered for dismissal at the 2 pm March 22nd meeting of the Student Performance Committee. As you have requested review as soon as possible, we will attempt to reschedule this meeting. Absent further written notice from me, you should plan to appear before the Committee on March 22nd.

The rules and procedures to be followed at this meeting are given in the 2005-2006 Student Handbook, which you received at the beginning of the year. You are encouraged to be available for the meeting to meet with the Committee should the members wish to speak with you. You may also submit a letter to the Committee for distribution to all the members at the meeting, whether or not you choose to appear at the meeting. In accordance with the Student Handbook, please know I will be available to meet with you as needed before the meeting. Please plan to check in with Rena Thorstensen in KAM 100-D by 1:45 on the day of the meeting.

Jeff, if you have any questions regarding the content of this letter or the decisions of the

1975 Zonal Avenue
KAM 100 B
Los Angeles,
California 90089-9020
Tel: 323 442 2553
Fax: 323 442 2663

N-35

**USC 0539**

Student Performance Committee, please be sure to clarify with me. Otherwise, I wish you well as you comply with the provisions the Committee has specified for you.

Sincerely yours,

Peter J. Katsufrakis, MD, MBA
Associate Dean for Student Affairs

cc:     Student File

N-36

USC 0540

**EXHIBIT C**

## ACADEMIC PROBATION AND DISMISSAL

### Academic Probation

A student who has an unsatisfactory performance in any transcript component of the curriculum will be placed automatically on academic probation. In addition, if a student becomes ineligible for promotion for any reason, the student is placed automatically on probation.

The Year I/II Student Performance Committee or the Clinical Sciences Performance Committee may place a student on probation at any time during the student's enrollment.

A student may be placed on probation by the Associate Dean for Student Affairs for either academic or non-academic matters without convening the appropriate committee on student performance. The student may meet with the Associate Dean for Student Affairs to discuss whether probation is warranted, and also has further right of appeal to the appropriate committee on student performance.

At the time a student is placed on probation, s/he will be informed of the reason for probation, the terms of probation, the duration of probation, and any other matters deemed pertinent by the Committee or Associate Dean.

A student is allowed only one repeat of an academic year during his/her enrollment at the Keck School of Medicine.

A student may be dismissed from the Keck School of Medicine without first having been placed on probation.

### Procedure for Dismissal

1.  A student who is being considered for dismissal is asked to meet with the Associate Dean for Student Affairs no later than ten (10) days prior to the appropriate Performance Committee meeting so that any extenuating circumstances may be made known. Time is made available for as many meetings as desired.

2.  The student will receive a written statement that he/she may be considered for academic dismissal at least ten (10) days prior to the meeting of the Committee on Student Performance.

3.  The student may inspect his/her entire medical school file, including material upon which the proposed dismissal is based.

4.  The student will be given an opportunity and is urged to appear before the Committee on Student Performance when a recommendation for dismissal is being considered. The student may waive his/her right to such an appearance. The student should notify the Associate Dean for Student Affairs in writing within five (5) business days prior to the meeting of his/her intent to appear.

5.  The student shall be given a written copy of all rules and procedures to be followed at least ten (10) days prior to the student's hearing.

6.  A student may be accompanied by counsel at the Committee meeting but must inform the Associate Dean for Student Affairs of this intent at least ten (10) days prior to the meeting.

7.  A quorum (two-thirds of the membership) must be present to vote on dismissal. Affirmative votes by two-thirds of the members present are necessary for dismissal. If a Committee member is unable to attend a meeting, he/she may send an alternate who has prior approval of the Senior Associate Dean for Academic Affairs. The alternate has full authority to act in the absence of the regular Committee member.

USC 0130

8.  When dismissal is being considered, the student may ask the student members of the Committee to be excused. This request must be submitted to the Office of Student Affairs in writing prior to the start of the Committee meeting.

9.  At the students' request, he/she will be presented with all the evidence against him/her, including academic reports and evaluations used in arriving at the summation of his/her performance.

10. The student will have an opportunity to present any information to the Committee regarding his/her performance, using any relevant evidence including affidavits, exhibits and oral testimony. If the student desires copies of written materials to be distributed to Committee members, he/she must present them to the Office of Student Affairs at least three (3) business days before the meeting, or prepare the materials him/herself.

11. Recommendations for student dismissal must be based upon the evidence presented at the hearing.

12. Upon termination of the Committee meeting, the recommendations of the Committee will be transmitted orally to the student by the Chairperson of the respective Committee on Student Performance. The recommendations of the Committee will be transmitted in writing to the Senior Associate Dean for Educational Affairs and the student within three (3) business days following termination of the meeting.

13. The student may appeal the Committee's recommendation to the Senior Associate Dean for Educational Affairs no later than ten (10) business days following transmittal of the Committee's recommendation.

14. The Senior Associate Dean for Educational Affairs may choose to uphold, to reverse, to ask the Committee to reconsider, or may choose to appoint an ad hoc committee to hear the student's appeal.

15. The members of this ad hoc hearing committee shall be faculty members who have not been involved in the decision to dismiss. The Chairperson of the respective Committee on Student Performance shall present the findings of the Committee on Student Performance to the ad hoc appeals committee but shall not sit as a voting member of said Committee.

16. The ad hoc hearing committee shall render its decision and submit its recommendation in writing to the Senior Associate Dean for Educational Affairs within five (5) business days after the meeting.

17. Following receipt of the Committee on Student Performance or ad hoc hearing committee recommendation, the Senior Associate Dean for Educational Affairs will issue a final decision in writing to the student. **There is no appeal from the Senior Associate Dean's decision.**

D-38

USC 0131

**EXHIBIT F**

From Peter J Katsufrakis <pkatsu@usc.edu>

Sent Friday, March 17, 2006 10:09 am
    To merriman@usc.edu , lswhite@usc.edu , budartur@usc.edu
    Cc jmball@usc.edu
Subject Tarasoff warning

I have given your names to Dr. Clayton Bullock, the psychiatrist treating
Jeff Isaacs at UCLA Neuropsychiatric Institute, so that he can speak with
you. Dr. Bullock called me today to inform me that Jeff had made
threatening though non-specific comments, so that he (Dr. Bullock) felt
obligated to notify under the Tarasoff decision.

Jeff apparently has said "I don't think they'll dismiss me because they're
afraid I'll come in with a gun" and "You have no idea how dangerous I'll
become." Clearly these are not directed against any of you, but because of
your involvement in this matter I felt that you should be notified,
too. Jeff is presently hospitalized on a 14-day hold, and I have asked Dr.
Bullock to notify me when Jeff is no longer under his direct supervision.

I have reviewed this with Jim Ball, and I am also providing Dr. Bullock
with the names of specific individuals I believe may be at risk. Because
you are each out of the office today, I wanted to notify you via this email
that Dr. Bullock would be trying to reach you. Please let me know if you
have questions or suggestions.


Peter J. Katsufrakis, MD, MBA
Associate Dean for Student Affairs
Keck School of Medicine
University of Southern California
1975 Zonal Avenue, KAM-100E
Los Angeles, CA 90033

Tel.   323-442-2553
Fax   323-442-2663

P-39

USC 0212

**EXHIBIT Q**



**USC**

UNIVERSITY
OF SOUTHERN
CALIFORNIA

**Keck School of Medicine**
University of Southern California

June 8, 2006

Mr. Jeff Isaacs
425 Broadway #408
Santa Monica, CA 90401

Office of
Student Affairs

In care of:    Nina Marino, Attorney at Law
               9454 Wilshire Blvd., Suite 500
               Beverly Hills, CA 90212

Dear Mr. Isaacs:

As you know, the Year I/II Student Performance considered your record at the School of Medicine at their meeting yesterday, June 7, 2006.

Your attorney, Nina Marino, appeared on your behalf. Dr. Wayne Sandler and Dr. Fred Kyut were also present, and teleconferencing was provided so you could speak with the Committee. I provided a packet of materials to each Committee member (I had previously given you a duplicate copy). Ms. Marino also provided a set of documents and exhibits for the members.

After due deliberation, the Committee determined that you are to be dismissed from the School of Medicine for behavior that was not consistent with the essential characteristics and abilities required for completion of the M.D. degree at the Keck School of Medicine.

The Student Handbook states that any student who is recommended for dismissal by the Committee may appeal that decision to the Senior Associate Dean for Academic Affairs of the school. You have ten working days from the receipt of this letter to file your appeal if you wish to do so. Your appeal should be addressed to Dr. Clive Taylor, Senior Associate Dean for Academic Affairs, 1975 Zonal Avenue, KAM 205-A, Los Angeles, CA 90033; phone (323) 442-1877.

Sincerely yours,

Peter J. Katsufrakis, MD, MBA
Associate Dean for Student Affairs

cc:    Student File

1975 Zonal Avenue
KAM 100 B
Los Angeles,
California 90033
Tel: 323 442 2553
Fax: 323 442 2663

Q-40

**EXHIBIT R**

## UNIVERSITY OF SOUTHERN CALIFORNIA KECK SCHOOL OF MEDICINE

### ESSENTIAL CHARACTERISTICS AND ABILITIES REQUIRED FOR COMPLETION
### OF THE MD DEGREE AT THE USC SCHOOL OF MEDICINE

**PREAMBLE**
The MD degree is a broad undifferentiated degree attesting to general knowledge in all fields of medicine and the basic skills required for the practice of medicine. Essential characteristics and abilities required for completion of the MD degree consist of certain minimum physical and cognitive abilities, and sufficient mental stability to provide reasonable assurance that candidates can complete the entire course of study and participate fully in all aspects of medical training. The Keck School of Medicine expects its graduates to become fully competent physicians capable of completing graduate medical education, passing licensing exams, and obtaining medical licenses. The Keck School of Medicine will provide reasonable accommodation to prepare its students.

The Keck School of Medicine has an ethical responsibility for the safety of patients with whom the candidates will come into contact both before and after graduation. Therefore, patient safety is a major factor in establishing requirements for physical, cognitive, and emotional capabilities of candidates for admission, promotion and graduation.

All students of medicine must possess those intellectual, ethical, physical, and emotional capabilities necessary to undertake and achieve levels of competence in the full curriculum required by the faculty. An avowed intention to practice only a narrow part of clinical medicine does not alter the requirement that all students take and achieve full competence in the full curriculum.

Essential characteristics and abilities prescribed here are a prerequisite for admission, promotion and graduation from the Keck School of Medicine. All matriculants, students and graduates must meet all prescribed essential characteristics and abilities.

**I.  PHYSICAL REQUIREMENTS:** After reasonable training and experience, the candidate must be able to observe and participate in demonstrations and experiments in the basic sciences, including but not limited to dissection of cadavers, examination of gross specimens in gross anatomy, pathology laboratory and neuroanatomy laboratories, preparation of microbiologic cultures, and microscopic studies of microorganisms and tissues in normal and pathologic states (e.g., streak plates, perform gram stains and use a microscope) necessary for such studies. Observation of gross and microscopic structures necessitates the functional use of the senses of vision and touch and is enhanced by the functional sense of smell.

After reasonable training and experience, the candidate must be capable of performing a complete physical examination, including observation, palpation and percussion and auscultation. The candidate must be capable of using instruments, such as, but not limited to, a stethoscope, an ophthalmoscope, an otoscope and a sphygmomanometer. The candidate must be capable to performing clinical procedures such as, but not limited to, the following: pelvic examination, digital rectal examination, drawing blood from veins and arteries and giving intravenous injections, basic cardiopulmonary life support, spinal puncture and simple obstetrical procedures. The candidate must be capable of performing basic laboratory tests, using a calculator and a computer, reading an EKG, and interpreting common imaging tests. The applicant must be able to move in the clinical setting so as to act quickly in emergencies. At the conclusion of the Introduction to Clinical Medicine course, the student will demonstrate proficiency in the skills described above. By the conclusion of the clinical clerkships, the student should achieve full competence in the skills described above including the ability to synthesize and organize these skills.

**II.  COMMUNICATIONS:** A candidate must be able to communicate with, to receive communication from, and to observe patients in order to elicit information, describe changes in mood, activity and posture, and perceive nonverbal affective and gestural communication. These communication skills also must enable the candidate to obtain a medical history in a timely fashion from a wide variety of patients, and to communicate effectively, efficiently and sensitively with all members of the health care team, other professionals, patients and their families. Communication includes speech and writing. The student must be able to produce a written "write-up" in the clinical rotations, which includes patient history, physical exam and assessment. In addition, the candidate must be able to comprehend written material sufficiently well to understand accurately common medical records, laboratory reports, and pharmacological prescriptions.

R-41

**USC 0064**

**III. INTELLECTUAL-CONCEPTUAL, INTEGRATIVE AND QUANTITATIVE ABILITIES:** A candidate must have sufficient cognitive (mental) capacities to assimilate the technically detailed and complex information presented in formal lectures, small group discussions, medical literature, individual teaching settings and clinical settings. A candidate must be able to measure, calculate, reason, analyze and synthesize information across modalities, appreciate three-dimensional spatial relationships among structures and logical sequential relationships among events, and form and test hypotheses in order to enable effective and timely problem-solving in diagnosis and treatment of patients.

**IV. BEHAVIORAL AND SOCIAL ATTRIBUTES:** A candidate must possess the emotional health, maturity and self-discipline required for full use of one's intellectual and judgmental ability and for successful participation in, and completion of, the course of study leading to the MD degree. These include but are not limited to attendance, integrity, honesty, conscientiousness in work, teamwork and other attributes described in ICM. The candidate must accept responsibility for learning, exercising good judgment, and promptly complete all responsibilities necessary for sensitive and effective relationships with patients and others. Candidates must be capable of interactions with patients and health care personnel in a caring and professional manner. The candidate must be able to tolerate physically taxing workloads, to function effectively under stress, to adapt to changing environments and to display flexibility.

**V. SAFETY:** The Keck School of Medicine has responsibility to consider the safety and welfare of patients and others. Should a candidate have a condition that would place patients or others at significant risk, that condition may be the basis for denial of admission or dismissal from school. An otherwise qualified individual shall not be excluded from admission or participation in educational programs and activities solely by reason by his/her physical handicap, or medical condition. Students must adhere to universal precaution measures. Students must be able to comply with all school requirements working in a clinical environment and with hazardous materials.

**VI. EVALUATION:** The Keck School of Medicine may require that an accepted student undergo an evaluation at the school's expense for the purpose of determining whether an accepted applicant or student meets these essential characteristics and abilities.

The University of Southern California Keck School of Medicine does not discriminate against otherwise qualified individuals who apply for admission to the MD degree program or who are enrolled as medical students. The designated disabilities coordinator with regard to applicants with disabilities is the Dean for Admissions. The designated disabilities coordinator for enrolled medical students with disabilities is the Coordinator of Disabled Issues who may be contacted through the Office of Student Affairs. Reasonable accommodations will be granted upon request; requests should be directed to the appropriate disabilities coordinator.

Are you capable of meeting these essential characteristics and abilities?   YES ✓   NO___

If not, please explain in the space provided (use additional space if necessary).   **MAR 0 3 2005**

_____

_____

_____

Print Name _Jeffrey  D.  Isaacs_

Signature _Jeffrey  D.  Isaacs_    Date _3/1/05_

The USC document on essential characteristics and abilities required for a medical degree was adapted from the Medical College of Wisconsin document on technical standards (1995).

R-42

# PROOF OF SERVICE

STATE OF CALIFORNIA      )
COUNTY OF LOS ANGELES )

    I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action.  My business address is 27240 Turnberry Lane, Suite 200, Valencia, CA 91355.

    On March 28, 2008, I caused to be served the foregoing documents described as:

**DECLARATION OF PETER J. KATSUFRAKIS IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**

on the person listed as follows:

Jeffrey David Isaacs
3553 West Chester Pike
PMB #177
Newtown Square, PA 19073

☒    (BY MAIL) I enclosed the documents in a sealed envelope addressed to the persons above and placed the envelope for collection and mailing, following our ordinary business practices.  I am readily familiar with this firm's practice for collecting and processing correspondence for mailing.  It is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid at our firm's office address in Valencia, California.  Service made pursuant to this paragraph shall be presumed invalid if the postal cancellation date on the envelope is more than one day after the date of deposit for mailing contained in this affidavit.

    Executed on March 28, 2008 in Valencia, California.

    I declare under penalty of perjury under the laws of the state of California that the above is true and correct.

__**Robin Fink**__              _____
   **Type or Print Name**          **Signature**